4810-8686-6440, v. 1

# EXHIBIT B *part 1*

Certified
Copy

# CERTIFIED
# CONDENSED TRANSCRIPT
# DEPOSITION OF
# JOYCE ZAIC

Date:        May 25, 2011

Case:

Joyce Zaic

vs.

Las Vegas Metropolitan Police Department

Case No.:        2:10-cv-01814-PMP-LRL

**CAMEO KAYSER & ASSOCIATES**
7500 West Lake Mead Suite 286
Las Vegas, NV  89128
(702) 655-5092
(702) 433-5726

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2            STATE OF NEVADA
 3            * * * * *
 4   JOYCE ZAIC,              )  Case No:
                              )
 5        Plaintiff,          )  2:10-cv-01814-PMP
                              )  -LRL
 6      vs.                   )
                              )
 7   LAS VEGAS METROPOLITAN   )
     POLICE DEPARTMENT, a     )
 8   political subdivision of )
     the STATE OF NEVADA;     )
 9   DANIELLE PIEPER,         )
     individually; B. EAGER   )
10   P#6189, individually, and)
     in his official capacity as )
11   a police officer; T.     )
     FREDERICK P#9793,        )
12   individually, and in his )
     official capacity as a   )
13   police officer; SUNRISE  )
     MOUNTAINVIEW HOSPITAL,   )
14   INC.; NEAL, a security   )
     guard for MOUNTAINVIEW   )
15   HOSPITAL; CHRISTOPHER    )
     SIMMS; security guard for)
16   MOUNTAINVIEW HOSPITAL; JOHN )
     DOES I through X; and ROE )
17   INSTITUTIONS I through X, )
     inclusive,              )
18                            )
        Defendants.           )
19   _____)
20     VIDEOTAPED DEPOSITION OF JOYCE ZAIC
21       At Marquis Aurbach Coffing
         On Wednesday, May 25, 2011
22            At 11:10 a.m.
23
         At 10001 Park Run Drive
24          Las Vegas, Nevada
25
     Reported by: Cameo L. Kayser, RPR, CCR No. 569
```

Page 2

```
 1   APPEARANCES:
 2
 3   For the Plaintiff:
          CAL J. POTTER, III, ESQ.
 4        Potter Law Offices
          1125 Shadow Lane
 5        Las Vegas, Nevada 89102
 6
 7   For the Defendants LVMPD, Officer Frederick, and
     Officer Eager:
 8        JOSHUA L. BENSON, ESQ.
          Marquis Aurbach Coffing
 9        10001 Park Run Drive
          Las Vegas, Nevada 89145
10
11
     For the Defendant Danielle Pieper:
12        RAYMOND R. GATES, ESQ.
          Lauria Tokunaga Gates & Linn, LLP
13        1755 Creekside Oaks Drive
          Suite 240
14        Sacramento, California 95833
15
     For the Defendant MountainView Hospital:
16        CASEY W. TYLER, ESQ.
          Hall Prangle & Schoonveld, LLC
17        777 North Rainbow Boulevard
          Suite 225
18        Las Vegas, Nevada 89107
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   WITNESS                    PAGE
     JOYCE ZAIC
 3
     Examination by Mr. Benson        5
 4   Examination by Mr. Tyler        101
     Examination by Mr. Gates        175
 5   Further Examination by Mr. Tyler   220
     Further Examination by Mr. Benson  221
 6   Further Examination by Mr. Gates   222
 7
              E X H I B I T S
 8
     EXHIBITS                   PAGE
 9
     Exhibit A   Copy of Charges         46
10
     Exhibit B   Copy of Order          106
11               (Maine case)
12   Exhibit C   Copy of Handwritten Notes   117
13   Exhibit D   List Patient Notes       118
14   Exhibit E   Incident Report         124
15   Exhibit F   Risk Management Report    134
16   Exhibit G   Christopher Simms' Log Notes  134
17   Exhibit H   Trespass Card          160
18   Exhibit I   Incident Report         188
19   Exhibit J   Incident Report         190
                 (With Color Photographs)
20
     Exhibit K   Incident Report         195
21
     Exhibit L   Temporary Restraining Order   200
22
23
24
25
```

Page 4

```
 1        INSTRUCTION NOT TO ANSWER
 2   DESCRIPTION                 PAGE
 3   Privileged Information - Criminal Case   45
 4   Form                       47
 5   Privileged Information - Criminal Case   47
 6   Privileged Information - Criminal Case   103
 7   Attorney/Client            109
 8   Privileged Information - Criminal Case   114
 9   Privileged Information - Criminal Case   177
     (Wiretapping)
10
     Privileged Information - Criminal Case   178
11   (Wiretapping)
12   Privileged Information - Criminal Case   179
     (Wiretapping)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CAMEO KAYSER & ASSOCIATES (702) 655-5092

1   (Prior to the commencement of the
2   proceedings, Rule 30(b)(4) was waived.)
3   Thereupon --
4   JOYCE ZAIC
5   was called as a witness by the Defendants Las Vegas,
6   Metropolitan Police Department, Officer Frederick,
7   and Officer Eager, and having been first duly sworn,
8   testified as follows:
9   EXAMINATION
10  BY MR. BENSON:
11      Q.  Thank you.  Good morning.  My name is
12  Josh Benson.  I represent the Las Vegas Metropolitan
13  Police Department and the officers in this case.
14      Will you please state and spell your
15  name.
16      A.  Joyce Marilyn Zaic, J-o-y-c-e,
17  M-a-r-i-l-y-n, Zaic, Z-a-i-c.
18      Q.  Have you ever been deposed before?
19      A.  No.
20      Q.  Briefly before we get into it, I want to
21  just go over some basic things to know about a
22  deposition.
23      There is a court reporter on your right,
24  and you just took an oath to -- actually --
25  Ms. Zaic, the court reporter on your right just gave

1   more facts regarding that question later on, feel
2   free to interrupt and add those facts.
3       If you need a break at any time, let us
4   know, and we can stop, allow you -- we will finish
5   the question we are on and allow you time to take a
6   break.
7       Again, since you are with a court
8   reporter and your testimony is being recorded, if
9   you testify differently at trial, we can use this
10  testimony here today to impeach you.
11      Do you understand that?
12      A.  Yes.
13      Q.  How do you feel today?
14      A.  I feel good.
15      Q.  Good.  Are you on any medications?
16      A.  No.
17      Q.  Have you had any alcohol in the last
18  12 hours?
19      A.  No.
20      Q.  Is there anything preventing you from
21  giving accurate testimony?
22      A.  No.
23      Q.  Do you have any questions about what we
24  have covered?
25      A.  No.

1   you an oath to tell the truth.  That's the same type
2   of oath that you would take in a court of law and it
3   is sworn to tell the truth.
4       Do you understand that?
5       A.  Yes.
6       Q.  During the deposition if I ask you any
7   yes or no questions, I would ask that you answer
8   with yes or no.  It is hard for the court reporter
9   to take down nods of heads or uh-huh type answers.
10      Do you understand that?
11      A.  Yes.
12      Q.  Also, in order to help keep a clear
13  record, allow me to finish questions before you
14  answer.  I will do the same and allow you to finish
15  the answer before I ask the question.  Sometimes we
16  have a tendency to anticipate answers or whatnot.
17      If you don't understand a question,
18  please tell me that you don't understand so I can
19  restate it.  If you answer a question, I will assume
20  you understood it.
21      Do you understand that?
22      A.  Yes.
23      Q.  Today we are asking for your best and
24  complete answer.  So, for instance, if I ask you a
25  question early on in the deposition and you remember

1       Q.  Have you talked with anyone about your
2   deposition today?
3       A.  No.
4       Q.  Where were you born?
5       A.  Las Vegas, Nevada.
6       Q.  Have you lived here your whole life?
7       A.  Yes.
8       Q.  And what is your current address?
9       A.  4116 Rubidoux Drive, 89108, Las Vegas,
10  Nevada.
11      Q.  Can you spell that address for us,
12  Rubidoux?
13      A.  R-u-b-i-d-o-u-x.
14      Q.  How long have you lived at that address?
15      A.  30 years.
16      Q.  Where did you live before that?
17      A.  On the other side of town with my mother.
18      Q.  And what is your birth date?
19      A.  February 2nd, 1968.
20      Q.  And did you -- so you went to high school
21  here in Nevada?
22      A.  Yes.
23      Q.  What high school did you go to?
24      A.  Western High School.
25      Q.  Did you graduate?

Page 9

1    A.   Yes.
2    Q.   What year did you graduate?
3    A.   1986.
4    Q.   Did you go to any college?
5    A.   Yes.
6    Q.   What college did you go to?
7    A.   CSN.
8    Q.   Did you get a degree from CSN?
9    A.   No.
10   Q.   Have you been to any technical schools?
11   A.   Yes.
12   Q.   What type of schools?
13   A.   Cosmetology school, real estate school.
14   Q.   Did you get degrees from both of those
15   schools?
16   A.   Yes.
17   Q.   And how many semesters did you attend CSN
18   for?
19   A.   I took classes on and off; so it wasn't
20   on a semester basis.
21   Q.   And I want to go over your employment
22   history for a little bit.
23        Are you currently employed?
24   A.   No.  I'm between jobs.
25   Q.   What was your last job you had?

Page 10

1    A.   Casino Royale.
2    Q.   What years did you work at Casino Royale?
3    A.   I worked there from January 2011 until
4    just like a week ago.  I'm on the extra board; so
5    I'm not -- I'm not sure what's going on.
6    Q.   And what was your job duties there?
7    A.   Casino cocktail waitress, in the casino.
8    Q.   And why do you not work there anymore?
9    A.   They said to call back after the 1st.
10   Q.   The first of --
11   A.   Because I'm on extra board.
12   Q.   The 1st of June?
13   A.   Yes.
14   Q.   And before Casino Royale, where did you
15   work?
16   A.   The Tuscany Casino.
17   Q.   And what years did you work at the
18   Tuscany?
19   A.   I worked there -- I don't know the exact
20   dates.  This was just recently, right before that
21   one, right before the Casino Royale.
22   Q.   Did you work there for --
23   A.   Like the same, like 90 days or something,
24   approximately.
25   Q.   And what were your job duties at the

Page 11

1    Tuscany?
2    A.   Cocktail waitress in the casino.
3    Q.   And why did you leave the Tuscany?
4    A.   Probation.  I mean, I just failed
5    probation is what they said.
6    Q.   That you failed probation?
7    A.   That is what they said.
8    Q.   What do you mean by that?
9    A.   I don't really know.  You would have to
10   ask them.  I don't know.  They haven't --
11   Q.   Did any incidents occur while you worked
12   there?
13   A.   No.
14   Q.   Before the Tuscany, where did you work?
15   A.   Arizona Charlie's.
16   Q.   And when did you work at
17   Arizona Charlie's?
18   A.   I worked there -- I don't know the exact
19   dates -- approximately 2007 and 2008.  I worked
20   there for about ten months.
21   Q.   And what were your job duties at
22   Arizona Charlie's?
23   A.   Cocktail waitress in the casino.
24   Q.   And why did you leave Arizona Charlie's?
25   A.   I'm really not sure.  There is -- it's

Page 12

1    under investigation right now.  I was told not to
2    discuss that.
3    Q.   What is under investigation?
4    A.   The Arizona Charlie's.  I don't know.  I
5    don't know what's going on.
6    Q.   Were you fired from Arizona Charlie's?
7    A.   They terminated me.
8    Q.   What was the basis of their termination?
9    A.   I don't know.
10   Q.   Did they tell you?
11   A.   There's -- it's under investigation right
12   now; so the EEOC -- and I was told not to discuss
13   it.
14   Q.   Who's investigating it?
15   A.   The EEOC.
16   Q.   Upon your request?
17   A.   Yes.
18   Q.   And what did you ask the EEOC to
19   investigate?
20   A.   I was told not to discuss.  It's an open
21   case.
22   Q.   I understand that, and I don't want the
23   details of the investigation, but what complaint did
24   you make to the EEOC?
25   A.   Retaliation.

3 (Pages 9 to 12)

Page 13

1    Q.  Retaliation.  What was the retaliation
2    for?
3    A.  For the termination.
4    Q.  What were they retaliating for?
5    A.  It's an open case; so I don't really want
6    to discuss it.
7    Q.  But I think you can at least discuss your
8    complaints.  I don't want any details of the
9    investigation, but just your complaint that you made
10   to the EEOC regarding the retaliation claim.
11   A.  I told the supervisor to leave me alone.
12   He didn't want to leave me alone; so he retaliated
13   and terminated me instead.
14   Q.  Why did you tell him to leave you alone?
15   A.  He was bothering me.
16   Q.  In what ways was he bothering you?
17   A.  I was told not to discuss it.
18   Q.  Again --
19   A.  It's an open case.
20   Q.  -- I just want the basis of your
21   complaint, not the investigation.
22   A.  He was bothering me.
23   Q.  In what ways was he bothering you?
24   A.  He was harassing me.
25   Q.  Sexually?

Page 14

1    A.  I was told not to discuss it.
2    Q.  Again, I just want the basis of your
3    complaint, which you are permitted to discuss.  Your
4    attorney can object if there is a privilege to be
5    had.
6    A.  It's an open case; so that's my answer.
7    Q.  So you are refusing to answer the
8    question?
9    A.  No.  That is my answer.  It's an open
10   case.
11   Q.  I understand that.
12   A.  I'm not going to discuss it.
13   Q.  When you contacted the EEOC, what did you
14   allege the supervisor had done?
15   A.  Retaliate.
16   Q.  In what way?
17   A.  Harassment.
18   Q.  What type of harassment -- in what way
19   did the supervisor harass you?
20   A.  He harassed me.
21   Q.  Can you give me specifics on your
22   complaint?
23   A.  No.  That's it.  I cannot.  It's an open
24   case.
25   MR. BENSON:  Cal, I don't know if you

Page 15

1    want to assert a privilege or instruct her to answer
2    this question.  I personally don't see a privilege
3    issue.  We're just asking for the basis for --
4    MR. POTTER:  I'm not familiar with the
5    issue.  I mean, if you want me to talk to her, I can
6    go off the record and talk to her.  It's not a case
7    we are involved with.
8    MR. GATES:  I understand.  I think that
9    would be great, because I don't see a privilege
10   here, and she is under oath, and I think we need to
11   have some answers to the questions.
12   MR. POTTER:  So take a break.
13   (Off the record.)
14   BY MR. BENSON:
15   Q.  Ms. Zaic, we just took a break so you
16   could speak with your attorney.
17   What is the basis of your retaliation
18   charge against Arizona Charlie's?
19   MR. POTTER:  Just for the record, I'm
20   just going to object and instruct her to go ahead
21   and answer, but object on relevancy grounds, and
22   just ask for a continuing objection on that line of
23   questioning.  She is prepared to answer.
24   MR. BENSON:  Okay.
25   THE WITNESS:  Can you repeat the

Page 16

1    question?
2    BY MR. BENSON:
3    Q.  What is the basis of your retaliation
4    claim against Arizona Charlie's?
5    A.  Harassment.
6    Q.  What kind of harassment?
7    A.  It was just harassment, and then he
8    accused himself of sexually harassing me.  He turned
9    it into sexual harassment, and then he terminated
10   me.
11   Q.  You said he accused himself?
12   A.  The supervisor.
13   Q.  What is his name?
14   A.  His name is Edward Kulik.
15   Q.  Can you spell that for us?
16   A.  E-d-w-a-r-d, K-u-l-i-k.
17   Q.  And you said he accused himself of sexual
18   harassment?
19   A.  Yeah.  He said you're not going to accuse
20   Arizona Charlie's of sexually harassing you, and you
21   are going to get fired.  Within three weeks, I was
22   written up -- within two weeks, I was written up
23   multiple times, unjustified.
24   He kept writing me up for frivolous
25   things, and then they terminated me.  So they

Page 17

1 retaliated and terminated me. They turned an
2 anthill into a molehill and terminated me.
3    Q.  What type of things were you written up
4 for?
5    A.  Just insubordination or something. I
6 don't know.
7    Q.  Why were you --
8    A.  I don't have the case in front of me. It
9 was over two years ago.
10    Q.  Why did they say you were insubordinate?
11    A.  Because I wouldn't allow Edward Kulik to
12 touch me and to harass me. I told him to leave me
13 alone. He said, "I'm your boss. I don't have to."
14    Q.  In addition to the touching, was there
15 any other harassment?
16    A.  Multiple write-ups, yes. They had
17 security -- they pulled me from the middle of my
18 shift. Had security suspended me for I don't know
19 any reason. I have no idea. And had security walk
20 me out to my car. For a suspension they don't do
21 things like that. They only have security walk you
22 out to try to intimidate me. Security only --
23 you're supposed to walk out to the car when you're
24 terminated, not when you're suspended.
25    Q.  When security walked you out to your car,

Page 18

1 why did they remove you from the premises?
2    A.  Insubordination, I don't know. I don't
3 have that -- I don't have -- it was a suspension. I
4 don't know. I don't remember. I don't recall. I
5 have it all -- it's at home.
6    Q.  Is there anything else regarding your
7 claim to the EEOC that we have not discussed today?
8    A.  Not that I recall.
9    Q.  So correct me if I'm wrong, basically
10 your allegations is that you were written up
11 multiple times for insubordination without cause and
12 later fired?
13    A.  Correct.
14    Q.  Did you ever make any complaints of
15 sexual harassment?
16    A.  I don't recall.
17    Q.  Did you make any complaints to your
18 employers at Arizona Charlie's?
19    A.  I don't recall.
20    Q.  What would help you recall that?
21    A.  I don't recall. I'd have to review the
22 case.
23    Q.  You indicated you worked for
24 Arizona Charlie's from 2007 to 2008; is that
25 correct?

Page 19

1    A.  The end of 2007 to -- yes, the middle of
2 2008. I worked there ten months.
3    Q.  So approximately June 2008?
4    A.  Correct, yes.
5    Q.  What shift did you work while at
6 Arizona Charlie's?
7    A.  Extra board.
8    Q.  Now, from 2008 until you got a -- from
9 being fired at Arizona Charlie's until you begin
10 working for the Tuscany towards the end of 2010,
11 what did you do for employment?
12    A.  Unemployment.
13    Q.  Did you look for any jobs?
14    A.  Yes. I might have worked in between
15 then. I don't remember. Yes, I did. I looked for
16 jobs.
17    Q.  Prior to Arizona Charlie's in 2007, what
18 was your employment before then?
19    A.  I don't recall. I worked at
20 Barbary Coast.
21    Q.  When did you work at the Barbary Coast?
22    A.  2003 or -- I don't have the correct -- I
23 worked there for eight years, seven and a half
24 years. I don't have the approximate dates. I don't
25 have them with me. It was a long -- it was like

Page 20

1 over ten years ago; so I don't know.
2    Q.  Do you recall when you stopped working at
3 Barbary Coast?
4    A.  Approximately 2000 -- no, I don't.
5    Q.  Did you work at the Barbary Coast in
6 2007?
7    A.  No, I did not.
8    Q.  Did you work at the Barbary Coast in
9 2006?
10    A.  No, I did not.
11    Q.  Did you work at the Barbary Coast in
12 2005?
13    A.  No, I did not.
14    Q.  Did you work at the Barbary Coast in
15 2004?
16    A.  No, I did not. It was probably
17 approximately -- probably approximately '95 to 2003,
18 approximately. Maybe a year or two off, or a few
19 years off.
20    Q.  What was your job at the Barbary Coast?
21    A.  Cocktail waitress.
22    Q.  And why did you leave the Barbary Coast
23 in 2002 or 2003?
24    A.  They terminated me.
25    Q.  Why did they terminate you?

Page 21

1      A.  I don't recall.  It was too long ago.  I
2  don't remember.
3      Q.  Who was your supervisor at the time?
4      A.  I don't -- I don't even recall.
5      Q.  Is there anything that would help you
6  remember the reasons you were terminated?
7      A.  I think they wrote me up for -- what was
8  it? -- for arguing with another cocktail waitress or
9  something.  There was something that happened off
10  shift while we were clocked out or something.  I
11  don't even know.  The supervisor -- the manager
12  didn't terminate me.  HR did; so I have no clue.  I
13  don't even know.
14      Q.  Did you have any other write-ups while
15  you were working at Barbary Coast?
16      A.  I don't recall.  It was too long ago.
17      Q.  Did you file a complaint against the
18  Barbary Coast?
19      A.  Grievance.
20      Q.  Grievance?  What did you allege in your
21  grievance.
22      A.  I don't recall.  I put in there that I
23  was terminated and I don't know why, at that time.
24      Q.  Whatever happened with that grievance?
25      A.  It never went anywhere.

Page 22

1      Q.  Did you ever file any types of complaints
2  against the Tuscany?
3      A.  Yes.
4      Q.  What did you file with them?
5      A.  The Department of NERC, Nevada Equal
6  Rights Commission, has an age discrimination with
7  them.
8      Q.  So you feel you were discriminated based
9  on your age?
10      A.  I was terminated because of my age.
11  That's what I feel.
12      Q.  Whatever happened to that case?
13      A.  It's an open case.
14      Q.  Did you file any complaints against
15  Casino Royale?
16      A.  No.
17      Q.  Do you feel wronged by being released
18  from Casino Royale?
19      A.  I'm not released.  They just said to call
20  back after the 1st.  They never gave me a
21  termination slip.
22      Q.  But you have no complaints against them?
23      A.  I'm on the extra board.
24      Q.  But you have no complaints against
25  Casino Royale?

Page 23

1      A.  Not as of today, I don't.  Not right now.
2      Q.  What do you mean by "not right now"?
3      A.  I don't have any complaints against them.
4  I'm on the extra board.
5      Q.  If you call back after June 1st and they
6  say they don't have a position for you, would you
7  file a complaint?
8          MR. POTTER:  Objection; calls for
9  speculation.
10          THE WITNESS:  I don't know.  No.  I have
11  no idea.  If they say there is no work for me, then
12  that means there's no work for me that day.  Maybe
13  there will be another day.  They've never given me a
14  termination slip; so I don't know.
15  BY MR. BENSON:
16      Q.  From the time you left the Barbary Coast
17  in 2003 until Arizona Charlie's in 2007, did you do
18  anything for employment?
19      A.  I don't recall.  No.
20      Q.  How did you live during that time?
21      A.  My savings, and also lived with my
22  father.
23      Q.  Any other ways you paid your bills
24  besides your savings and living with your father?
25          MR. POTTER:  Objection; relevancy.

Page 24

1          THE WITNESS:  I don't have any bills.
2  BY MR. BENSON:
3      Q.  So from 2003 to 2007, you lived off your
4  savings and lived with your father?
5      A.  Correct.
6      Q.  And you didn't have any employment during
7  that time?
8      A.  Not that I can recall, no.  I was -- no,
9  I didn't have any employment.
10      Q.  Prior to the Barbary Coast, where did you
11  work?
12      A.  It's going back a long time, but I think
13  I worked at the Union Plaza.
14      Q.  What years did you work at the
15  Union Plaza?
16      A.  I don't recall.
17      Q.  Do you recall why you left the
18  Union Plaza?
19      A.  I quit.
20      Q.  Why did you quit?
21      A.  I didn't like the clientele downtown.  I
22  didn't like the environment.  I didn't like the
23  dangerous -- it was dangerous down there.  I didn't
24  like it.
25      Q.  Do you have any specific experiences that

Page 25

1  made you not like it down there?
2      A.  Not at all.  I just don't like it.  I
3  just don't like being around that environment down
4  there.
5      Q.  What do you mean by "that environment"?
6      A.  There's a lot of homeless people walking
7  around.  There's a lot of -- it's not my -- I just
8  didn't like it at all, that environment, those type
9  of people down there.
10         It's a different type of clientele.  I
11 mean, living off of people's Social Security checks
12 every month.  I think he owned the El Cortez also,
13 and he -- you know, the senior citizens would go in
14 there and -- it's just a bad environment.  I didn't
15 like it.  I didn't like the clientele.
16     Q.  You said "he" during your answer.  Who do
17 you mean by he?
18     A.  The owner, Jackie Gaughan.  At that time,
19 he was the owner.  I don't know who owns it now.  I
20 don't even know if they're still open.
21     Q.  Do you have any complaints against the
22 Union Plaza?
23     A.  No.
24     Q.  Did you file any grievance or type of
25 complaints with any agency?

Page 26

1      A.  No.
2      Q.  Did you file any complaints with your
3  supervisors?
4      A.  No.  My supervisors were nice.
5      Q.  How many years did you work at the
6  Union Plaza?
7      A.  I don't even recall.  Probably maybe a
8  year if even that, maybe less, a couple months.  I
9  don't recall, though.
10     Q.  I know we are getting back there now.
11        Prior to the Union Plaza, do you recall
12 where you worked?
13     A.  I worked at O'Sheas -- oh, wait, prior to
14 the Union Plaza, I worked Horseshoe.
15     Q.  Were you a cocktail waitress there?
16     A.  Yes.
17     Q.  Why did you leave the Horseshoe?
18     A.  I quit.
19     Q.  Why did you quit?
20     A.  I didn't like the environment, clientele.
21     Q.  What do you mean by that?  What do you
22 mean by you didn't like the clientele?
23     A.  I don't like the type of people that had
24 to hang out in that casino.  I was young.  I didn't
25 like it.

Page 27

1      Q.  How long did you work there for?
2      A.  Until I was -- maybe about a month or so.
3      Q.  Did you ever get written up for anything
4  while --
5      A.  Approximately.  No, never.
6      Q.  Did you ever make any complaints?
7      A.  Never.  My boss was nice.
8      Q.  And then before the Horseshoe you worked
9  at O'Sheas?
10     A.  I think I worked at the Excalibur, but I
11 don't remember if that was before or after.  The
12 union would dispatch me out to these places, so --
13 Excalibur, I remember I worked there.
14     Q.  Do you recall what year you worked at the
15 Excalibur?
16     A.  No.  It was like 20 years ago.  I don't
17 know.
18     Q.  Then you also worked at O'Sheas?
19     A.  Yes.  Two years.
20     Q.  Were you fired from the Excalibur or
21 O'Sheas?
22     A.  Not the Excalibur.  I was not fired from
23 there.
24     Q.  Were you fired from O'Sheas?
25     A.  Yes.

Page 28

1      Q.  Why were you fired --
2      A.  It was the same owner, O'Sheas and the
3  Flamingo.  I don't know if they had me working at
4  the Flamingo or O'Sheas.  I don't know what they put
5  it under.
6      Q.  Why were you fired from there?
7      A.  I don't recall.  It was something
8  frivolous like arguing with another cocktail
9  waitress and we both were terminated.
10     Q.  Do you recall what year this was?
11     A.  I don't recall.  It was over 20 years
12 ago.
13     Q.  Did you file any complaints over that
14 termination?
15     A.  Just with the union.
16     Q.  What did the union do about it?
17     A.  Nothing.
18     Q.  What was your complaint?
19     A.  I don't know.  It was 20 years ago.  I
20 was -- I have no idea.  I don't recall.  I -- it's
21 past.
22     Q.  Have you filed any other complaints with
23 the union other than the one from O'Sheas and the
24 Flamingo?
25     A.  I don't recall.  No.  I don't recall, no.

7 (Pages 25 to 28)

Page 29

1    Q.  I appreciate you scanning your memory for
2  all these employments.  Is there any other
3  employment you have had -- we just talked about the
4  Excalibur, O'Sheas, and Flamingo.
5        Any other employment that you can recall?
6    A.  You want all of my employment?  I worked
7  at the El Rancho Casino when I was like 18 as a
8  valet parker.  I worked at Imperial Palace probably
9  around when I was like 20, probably, 19, maybe 19,
10  18 as a busgirl.  I worked at the La Mirage Casino
11  as a cocktail waitress.  I worked at a few beauty
12  salons as a manicurist.  I worked at Kentucky Fried
13  Chicken when I was 16 for a few weeks.  And there
14  might be other employment in there, but I don't
15  recall.
16    Q.  And in working for the La Mirage,
17  Imperial Palace, El Rancho, KFC, or the beauty
18  salons, were you ever fired from any of those
19  employments?
20    A.  No.
21    Q.  Did you file any complaints against any
22  of those employers?
23    A.  No.
24    Q.  Are you married?
25    A.  No.

Page 30

1    Q.  Do you have any kids?
2    A.  No.
3    Q.  Do you have other family that lives in
4  Las Vegas?
5    A.  Yes.
6    Q.  And who lives in Las Vegas?
7    A.  My mother and my two brothers.
8    Q.  And what are their names?
9    A.  My mother's name is Marilyn Zaic.  My
10  brothers' names are Lewis Zaic, same last name as
11  mine, and Steve Zaic.
12    Q.  What is your relationship with your
13  mother?
14    A.  She's my mother.
15    Q.  What is your current relationship as far
16  as interactions, social, visiting, type of
17  relationship?
18    A.  We have our ups and downs.
19    Q.  What do you mean by you have your ups and
20  downs?
21    A.  We don't see eye to eye on a lot of
22  things, but she is still my mother.
23    Q.  Do you talk to her?
24    A.  Every so often.
25    Q.  What do you mean by "every so often"?

Page 31

1    A.  Not right now.
2    Q.  Why not right now?
3    A.  She doesn't call me.
4    Q.  When was the last time you talked to your
5  mother?
6    A.  A few months back, maybe over -- maybe
7  longer.  I don't really recall --
8    Q.  Why doesn't she call you?
9    A.  Probably in November.
10        MR. POTTER:  Objection; calls for
11  speculation.
12  BY MR. BENSON:
13    Q.  Do you know why she does not call you?
14    A.  I don't know.
15    Q.  Has she ever told you?
16    A.  Maybe because my brothers are telling her
17  not to, maybe.
18    Q.  Has your mother ever told you?
19    A.  No.
20    Q.  Has she ever voiced any concerns?
21    A.  I think she did tell me.  I think she did
22  say my brothers told her not to.  I don't recall.
23    Q.  Is your mother afraid of you?
24    A.  No.
25    Q.  Have you ever heard somebody tell you

Page 32

1  your mother's afraid of you?
2    A.  No.  My mother told me she's not afraid
3  of me.
4    Q.  Have your brothers ever indicated that
5  Marilyn is afraid of you?
6    A.  No.
7    Q.  If one of your brothers said that your
8  mother was afraid of you, would you disagree with
9  that statement?
10    A.  Absolutely, I would disagree.
11    Q.  What is your relationship with Lewis?
12    A.  We don't talk.
13    Q.  Why don't you talk?
14    A.  Because he doesn't want to talk to me.
15    Q.  Why doesn't he want to talk to you?
16    A.  I don't know.
17        MR. POTTER:  Objection; speculation.
18  BY MR. BENSON:
19    Q.  Has he ever told you why he doesn't talk
20  to you?
21    A.  He doesn't come around.  He never came
22  around, even when my dad was alive.  He never talked
23  to us.  He distanced himself.  He said his
24  psychiatrist told him to distance himself.
25    Q.  Have you ever had any issues with Lewis?

8 (Pages 29 to 32)

Page 33

1   A.   Just like any other brother and sister
2  relationship.
3   Q.   Have you ever filed any complaints
4  against him?
5   A.   I -- actually, they came to me, but I
6  didn't go to them.
7   Q.   Who is they --
8   A.   Internal affairs.
9   Q.   Internal affairs for who?
10   A.   The police department.
11   Q.   What did they come to you about?
12   A.   Battery, domestic violence.  They came to
13  me.  So no, I didn't go to them to file a complaint
14  against my own brother.
15   Q.   You have never made any allegations
16  against him?
17   A.   Oh, I put a TPO -- yes, that's a battery
18  domestic violence, and I also put a TPO on him.
19   Q.   When did you put a TPO on him?
20   A.   The day after my father died, passed
21  away --
22   Q.   Why did you do that?
23   A.   March 21st.  Because Lewis beat me up,
24  and he threatened me.  He threatened to kill me.
25  And I don't want him near the house.  It's where I

Page 34

1  live.  And he came in there, forced himself in
2  there, and he didn't have a legal right to be there.
3   Q.   Any other complaints you have ever made
4  against Lewis?
5   A.   Not that I can recall, just the -- just
6  the TPOs, one in Justice Court, one in Family Court,
7  at the same time.  Those are the same.  And the
8  battery domestic violence, and that's it that I can
9  recall.
10   Q.   Have you ever damaged any of his
11  property?
12   A.   No.
13   Q.   So you and Lewis don't talk; is that
14  correct?
15   A.   No.  His choice.
16   Q.   So if Lewis said, quote, She makes up
17  allegations and they are investigated and founded to
18  be unfounded, so the best thing I can do is stay
19  away.
20       Have you ever heard him say that?
21   A.   No.
22   Q.   Would you disagree with his statement?
23   A.   I would disagree with his statement.
24   Q.   If Lewis said you have damaged his
25  property, what does he mean by that?

Page 35

1   A.   I don't know.
2       MR. POTTER:  Objection; calls for
3  speculation.
4  BY MR. BENSON:
5   Q.   You have never damaged his property?
6   A.   No.  He damaged my property.
7   Q.   What did he damage?
8   A.   What did he damage -- there was another
9  one.  He came and kicked my door in.  I don't know
10  the date, but it was around that time after my
11  father passed, after I put the TPO on him.  He
12  kicked my door in.  His footprint was still on the
13  door.  I called the police on him.
14   Q.   Did you take any pictures of that?
15   A.   The door?  No, it's still broken.  Anyone
16  can go take a picture of it.  They still -- they own
17  one third of the house.  They can fix it.  They
18  broke it.
19   Q.   They own a third of the house?
20   A.   Yes.
21   Q.   And do they live in the house?
22   A.   No.
23   Q.   Just you live in the house?
24   A.   Yes.
25   Q.   Do they allow you to live in the house?

Page 36

1   A.   Yes.
2   Q.   Do they require you to pay rent?
3   A.   No.  It's my house.
4   Q.   But on their two-thirds that they own,
5  they don't require you to reimburse them for you
6  living in the house?
7   A.   No.  I pay everything in the house.  I
8  pay all the upkeep of the house.
9   Q.   But they don't require you to pay rent to
10  them?
11   A.   No.  It's my house.  I don't know how
12  that makes -- that makes no sense, pay rent to them
13  when I own one-third of the house.  They own
14  two-thirds.  They can move into their two-thirds if
15  they want.  Their two-thirds is vacant, as far as
16  I'm concerned.  No, they've never asked me to pay
17  rent.
18   Q.   What is your relationship with
19  Steve Zaic?
20   A.   He's my brother.
21   Q.   Do you talk with him?
22   A.   Yes.
23   Q.   When was the last time you talked with
24  him?
25   A.   Yesterday.

9 (Pages 33 to 36)

1    Q.  What did you talk about?
2    A.  He went and brought me to pick up my
3 paycheck.
4    Q.  Did you guys talk about this case?
5    A.  We don't discuss this case, no.
6    Q.  Are -- do you -- how often do you talk
7 with Steve during the week?
8    A.  Maybe a few times a week.  We used to
9 talk more.  We used to talk every day, and then we
10 don't anymore.  He became busy.  He got his juice
11 bar, and then he became too busy; so he didn't talk
12 every day.
13        And then he doesn't have his juice bars
14 and -- anymore; so we talk every so often.  We had
15 our falling out, just like brothers and sisters do;
16 so we wouldn't talk for a while, maybe a couple
17 weeks, maybe a few months, then we talk again.
18    Q.  What do you mean you had a falling out?
19    A.  We had a disagreement.
20    Q.  Over what?
21    A.  I don't recall.
22    Q.  How long ago was this?
23    A.  We had a disagreement over -- well, the
24 last disagreement we had was -- argument was with
25 his girlfriend, Danielle.

1    Q.  Back in 2008?
2    A.  Correct.
3    Q.  What was your relationship like with your
4 brother in March of 2008?  With your brother Steve?
5    A.  Well, we talked and -- but we did -- we
6 talked, but we didn't really communicate.  Prior to
7 that we weren't talking.  Prior to my dad being in
8 the hospital, we weren't talking.  So when my dad
9 went into the hospital, we started talking.
10    Q.  So prior to your dad in the hospital, how
11 long had it been before you talked -- how long had
12 it been that you had not talked to your brother
13 Steve?
14    A.  I don't recall.
15    Q.  A year?
16    A.  Possibly.
17    Q.  Two years?
18    A.  I don't recall.
19    Q.  Could it have been three years?
20    A.  I don't think it was that long, but it
21 could have been.
22    Q.  So it could have been upwards of three
23 years.  Could it have been four years?
24    A.  I don't recall.
25    Q.  So when your father went in the hospital,

1 you begin talking to him again?
2    A.  Yes.
3    Q.  Have you ever made any allegations
4 against your brother Steve?
5    A.  I don't recall.
6    Q.  Have you ever made a police report
7 against him?
8    A.  I don't recall.
9    Q.  What would help you recall?
10    A.  Probably nothing, because I don't
11 remember if I made a police report against him or
12 not.  Oh, I -- I think -- I don't remember for sure,
13 but I think his name was included in that -- when
14 they came and kicked my door in.  I don't know what
15 that's called, breaking and entering or something.
16 They just did it to scare me.
17    Q.  What did Steve do?
18    A.  They both were there.  They kicked my
19 door in.
20    Q.  What else did they do?
21    A.  And then they left.  They kicked it in to
22 scare me and then they ran, got in their car and
23 left.  They just wanted to scare me.
24    Q.  Did you see them?
25    A.  No.  I did not see them.  It's my own

1 brothers.  I can sense my own brothers.  It was
2 them.  If it was a burglary, they would have took
3 something or, you know, they would have -- they
4 would have took what they were after.  They didn't
5 take nothing.  They just kicked the door in, and I
6 screamed, and they left.
7    Q.  So you were at home when the door was
8 kicked in?
9    A.  Yes.  They knew I was home because my car
10 was there, my truck was there.
11    Q.  And after it was kicked in, you screamed?
12    A.  After I heard the door, yes.
13    Q.  And --
14    A.  Well, I was silent, and then I called
15 their names, and then -- yeah, I screamed.  I heard
16 the door being kicked in.  I screamed.  Somebody
17 was -- kicked the door in.
18    Q.  Did you scream right when the door was
19 kicked open?
20    A.  I believe so.
21    Q.  And right then they ran?
22    A.  I don't know if they ran.  I didn't see
23 them run, but they left.  That's what the neighbors
24 said.  They seen two big guys.  That's how I knew it
25 was my brothers also because they said they had seen

1  two big guys -- that's what they told the police --
2  two tall guys run, get in a pickup truck, and drive
3  away.
4      Q.  And what were your neighbors' names?
5      A.  I don't remember.  They don't live there
6  anymore.  They were -- lived across the street.  I
7  don't remember his name.  His name was -- wait a
8  minute.  He wasn't there very long.  I don't recall
9  his name.  I didn't talk to them very often.
10      Q.  The house directly across from your
11  street?
12      A.  Yes.  Somebody new is living there now.
13  They let it go into foreclosure.
14      Q.  Have you made any other allegations
15  against Lewis or Steve that we haven't talked about?
16      A.  Not that I can recall.
17      Q.  Where does Lewis currently live?
18      A.  I don't know.
19      Q.  Does he live in Las Vegas?
20      A.  I don't know.
21      Q.  When was the last time you saw Lewis?
22      A.  During the preliminary hearings for my
23  criminal wiretapping.
24      Q.  What did Lewis say --
25      A.  Well, wait.  I seen him -- no, that's the

1  last time.  I don't -- I might have seen him after
2  that, but I don't recall.  That's the last time I
3  remember seeing him.
4      Q.  Why was he at that preliminary hearing?
5      A.  To testify against me.
6      Q.  So he testified against you at that
7  hearing?
8      A.  Yes.
9      MR. POTTER:  I'm going to object to the
10  line of questions that dealt with the hearing.
11  BY MR. BENSON:
12      Q.  What did he say at that hearing?
13      A.  He testified that that was my voice on
14  the tape recording.  He confirmed that it was my
15  voice.  That was -- that's what he was there to do.
16      Q.  Did he ever at that hearing say why he
17  didn't talk to you anymore?
18      MR. POTTER:  Objection; relevancy.
19      THE WITNESS:  I didn't talk to him after
20  the hearing.  I didn't talk to him before the
21  hearing.  I didn't talk to him after the hearing.
22  BY MR. BENSON:
23      Q.  Did he state in his testimony why he
24  didn't talk to you anymore?
25      A.  He said he doesn't know.  He just said

1  just like what I'm saying.  We're brother and
2  sister.  We have our ups and downs.  He didn't say.
3  He just said that he's -- he said he's -- not during
4  the hearing but at another time -- I think before
5  that he said -- maybe after that, I don't recall.
6      However, he did say that he's getting
7  help.  He's on -- he was on -- the drugs -- on
8  drugs, and drugs made him act the way he did, and
9  he's getting help now, and he's in the 12-step
10  program, and he's in -- he's getting help for his
11  problems.
12      Q.  So your brother Lewis was on drugs?
13      A.  Yes.  And it started out as prescription
14  drugs and then -- or started out as recreation.
15  Then he would get prescriptions, and that's what he
16  said.  I don't really know.
17      Q.  And what -- when did he say this to you?
18      A.  I don't know if it was before -- I think
19  it was after I put the TPO on him.
20      Q.  So sometime after your father --
21      A.  It was after.  It was definitely after my
22  father passed.
23      Q.  Was it after the preliminary hearing?
24      A.  I don't recall.
25      Q.  Was it --

1      A.  Maybe.
2      Q.  Was it in 2008?
3      A.  I don't recall.  I believe it was after
4  2008.  It was after he was terminated from the
5  police department or after he doesn't work there no
6  more.  I don't know why.  I don't know.  Whenever he
7  was gone from the police department, retired,
8  terminated.  I don't know.  Forced into early
9  retirement, I don't know his situation.  It was
10  after that, though.
11      Q.  Ms. Zaic, your complaint makes some
12  allegations against police officers; so I need to
13  ask some questions about you and your family's
14  interactions with police officers.
15      Have you ever been arrested for a felony?
16      A.  Yes.
17      Q.  When -- how many times have you been
18  arrested?
19      A.  Twice, including the reason that we're
20  here today, so twice.
21      Q.  So one of your arrests was for the
22  incident we are here for today.
23      What was the other incident about?
24      MR. POTTER:  I will object to the other
25  incident.  It's been the basis of the motion to stay

1 and instruct her not to answer any questions
2 concerning it. It's a pending case is what she is
3 referring to.
4 BY MR. BENSON:
5     **Q.  I don't want to get into any**
6 **confidential, private information.**
7         **What allegations were made against you**
8 **on the basis of that arrest?**
9         MR. POTTER:  I will instruct her not to
10 answer.
11 BY MR. BENSON:
12     **Q.   Are you going to heed your Counsel's**
13 **instruction?**
14         THE WITNESS:  Yes.
15         MR. TYLER:  Cal, if I have the written
16 charges, could she just confirm those are the
17 charges?
18         MR. POTTER:  I mean, if you've got
19 something in writing.
20         MR. BENSON:  Thank you.
21         MR. POTTER:  I think -- I -- these are
22 the charges, but I think it's actually been
23 transferred to another department.  As we discussed
24 earlier, sometimes they move --
25         MR. BENSON:  Can we mark it as Exhibit 1,

1 please.
2         THE REPORTER:  1 or A?
3         MR. BENSON:  Do A.
4         (Whereupon, Exhibit A was
5          marked for identification.)
6 BY MR. BENSON:
7     **Q.  Ms. Zaic, I'm handing you what has been**
8 **marked as Exhibit A, which is from the**
9 **District Court regarding an active criminal case**
10 **involving you.**
11         **Is it true that you would have been**
12 **arrested that second time for attempt under**
13 **NRS 193.330, for obtaining and using personal ID**
14 **info pursuant to 205.463, for the interception of**
15 **wire slash radio communication under NRS 200.620,**
16 **and for penalties for wire slash oral communication**
17 **intercept under NRS 200.690?**
18         MR. POTTER:  I'm going to object to the
19 form of the question.
20         You can state whether you have been
21 arrested, but on the basis of what the allegations
22 are, I don't want you to comment on the allegations.
23 BY MR. BENSON:
24     **Q.  Were you arrested for obtaining and using**
25 **personal ID info?**

1         MR. POTTER:  Same objection.  I mean, the
2 document speaks for itself.
3         MR. BENSON:  Are you instructing her not
4 to answer?
5         MR. POTTER:  Yes.
6 BY MR. BENSON:
7     **Q.  Are you going to abide by Counsel not to**
8 **answer?**
9     **A.  Yes.**
10     **Q.  This criminal case doesn't have anything**
11 **to do with your current case, does it?**
12         MR. POTTER:  I will instruct her not to
13 answer because it calls for specific information
14 concerning this case; this case, meaning, the
15 criminal case that's pending.
16 BY MR. BENSON:
17     **Q.  Is the pending -- I just want to make**
18 **sure, you know, because we have been arguing over**
19 **this in hearings -- is the pending criminal case**
20 **regarding anything that happened in the hospital?**
21     **A.  I think it is.**
22     **Q.  What do you mean by you think it is?**
23         MR. POTTER:  I'm going to object as to
24 what her beliefs are under the pending criminal
25 case.

1 BY MR. BENSON:
2     **Q.  Other than the current pending arrest,**
3 **the arrest in 2008 that's the subject of this**
4 **complaint, have you ever been arrested?**
5     **A.  No.**
6     **Q.  So just those two times?**
7     **A.  Yes.**
8     **Q.  Has any of your friends or, quote, family**
9 **been arrested?**
10     **A.  No, not that I'm aware of.**
11     **Q.  You indicated --**
12     **A.  Well, Lewis -- I don't know if it's true.**
13 **They said Lewis was arrested for -- I don't know if**
14 **they gave him a ticket or what, I don't know.  But**
15 **they said he was arrested for driving while under**
16 **the influence of his medications or something.  I**
17 **don't know if he was.  He tells stories a lot, so --**
18 **he likes lying.  I don't know if he was arrested or**
19 **they gave him a ticket.  I don't know.**
20     **Q.  Lewis told you this?**
21     **A.  I don't remember who told me.  I don't**
22 **recall who told me, but it did come to my attention.**
23 **Either Steve or Lewis, one of them did.**
24     **Q.  And Steve and Lewis are both -- were both**
25 **police officers?**

1      A.   Yes.
2      Q.   Are either of them currently active
3  police officers?
4      A.   No.
5      Q.   Them being police officers, how does that
6  form your opinion of officers?
7      A.   I grew up liking them.  They were the
8  good guys.
9      Q.   But it changed --
10     A.   I became really interested in law.  When
11 I was a kid, a child, Steve would bring me to court.
12 When he first became a police officer, was what, 23,
13 24, 22 years old or something.  I was like 17.  He
14 was four years older than me.  He would bring me to
15 court and when he would get subpoenaed into court, I
16 would go into court and I'd sit there and listen.
17      So I got a feel for the courtroom, and it
18 was nice.  It was interesting, you know.  So I
19 became interested in law.
20     Q.   Did you ever apply to be a police
21 officer?
22     A.   No.  Not that I recall, no.
23     Q.   Have you ever applied for employment with
24 the police department?
25     A.   Not that I recall, but I might have

1  applied for some positions, maybe a clerk or
2  something.  I don't know.  I don't recall.
3           (Off the record.)
4  BY MR. BENSON:
5      Q.   All right.  Ms. Zaic, what is your
6  current opinion of police officers?
7           MR. POTTER:  Objection; relevancy.
8           Go ahead.
9           THE WITNESS:  The -- I don't have an
10 opinion of them.  They are doing the job.  Some of
11 them are good.  Some of them are bad.  Some of them
12 are really good, and some of them should not be
13 police officers.  Either they are not properly
14 trained, or they're just not cut out to be police
15 officers.
16 BY MR. BENSON:
17     Q.   Other than this incident that forms the
18 basis of your complaint, have you ever had any bad
19 interactions with police officers?
20     A.   Not that I can recall.  There was one
21 time -- I wouldn't call it a bad interaction.  I
22 don't even know what happened.  I was on my way to
23 work years ago when I was working at the
24 Barbary Coast, probably like 15 years ago.  I was on
25 my way to work, and the police officer pulled me

1  over.  I don't even remember for what.  Could be
2  speeding, I don't know, something, I don't know.
3  And I think he wanted me to sign the ticket or
4  something.  I don't remember.  It was a very long
5  time ago, and I don't even know what happened.
6           I think he brought me to jail or
7  something, but he didn't book me.  I don't even
8  know.  It was so long ago.  I think they towed my
9  Corvette, but I don't -- I think I had a Corvette at
10 the time.  I don't know, it was so long ago, but
11 yeah, there was one.  I don't even remember his
12 name.
13     Q.   Why did they take you to jail?
14     A.   I don't even remember if -- I wasn't
15 booked; so I don't even know.  For not signing a
16 ticket, I think, for not signing a speeding ticket.
17 And my brother said, Well, all speeding tickets you
18 are supposed -- you can -- it's a jailable offense
19 anyway.  This is what they told me.  It's a jailable
20 offense, and police officers can take people to jail
21 for speeding, but we never do.
22           And he shouldn't have did that.  He
23 shouldn't have took you to jail.  He should have
24 just gave you the ticket, and you should go to
25 internal affairs on him.  That's what Lewis told me.

1  He was an internal affairs person.  He's the one
2  that used to guide me.  At that time, we were on
3  talking terms, and he would tell me all about all
4  that stuff.  He's the one who told me to do that.
5  Steve didn't -- he didn't mention internal affairs
6  or nothing.  That's how long ago that was.
7      Q.   Did you -- go ahead.
8      A.   I think I did file.
9      Q.   You did file a complaint with internal
10 affairs?
11     A.   I think so.
12     Q.   What did you allege?  What was the basis
13 of your complaint?
14     A.   I don't recall.  That he took me to jail
15 for speeding.  I was really young.  I don't even
16 recall.
17     Q.   And you indicated earlier that you had
18 refused to sign the ticket?
19     A.   I don't recall.  I think I did.  I think
20 that's what it was.  It was frivolous.
21     Q.   Do you recall how fast you were going
22 when you were pulled over?
23     A.   No.
24     Q.   Were there any drugs or alcohol involved?
25     A.   No.  And Steve came to pick me up; so I

Page 53

1  think they did tow my car, or left it on the side of
2  the road, my Corvette.  I don't remember the
3  specifics, but I remember Steve came to pick me up
4  from the jail, and then he got pulled over by one of
5  his police officers.
6      He was a police officer at the time, and
7  he got pulled over and they asked him where he was
8  going in such a hurry.  And he told them, Picking up
9  my sister.  She's in jail.  That's all I remember.
10  I don't remember what happened with that ticket.  I
11  don't remember if I paid it.  I just don't even
12  remember.
13      Q.  So other than the incident about this
14  complaint and that prior incident with officers, any
15  other experience with the police that -- positive or
16  negative?
17      A.  There might have been, but I just don't
18  recall right now.
19      Q.  In 2008, was your father hospitalized?
20      A.  Yes.
21      Q.  When was he hospitalized?
22      A.  March 29 -- February 29th, 2008.
23      Q.  And how long was he hospitalized for?
24      A.  Until he passed away March 23rd, 23 days,
25  2008.

Page 54

1      Q.  During that time in the hospital, how
2  often would you visit your father?
3      A.  Every day.
4      Q.  Who else would visit your father?
5      A.  My two brothers, and my mother was there
6  because my two brothers brought her there.  She
7  didn't drive there by herself.
8      Q.  Anybody else visit her -- him?  Excuse
9  me.
10      A.  No.
11      Q.  Did he have any friends that would come
12  visit him?
13      A.  We didn't let anybody know.
14      Q.  You didn't let anybody know about his
15  hospitalization?
16      A.  No, no.  No friends came to visit.
17      Q.  What was he hospitalized for?
18      A.  My dad's friends were his family.
19  Children were his best friends.
20      Q.  What was your father hospitalized for?
21      A.  It was tests.  It was just supposed to
22  get tests.  I don't know.  They brought him there,
23  and he told them not to bring him there, and they
24  did anyways, the ambulance.
25      Q.  While your father was in the hospital,

Page 55

1  did you have any incidents or altercations or
2  problems with the hospital?
3      A.  Yes.
4      Q.  Were you ever asked to leave?
5      A.  Yes.
6      Q.  What type of incidents did you have with
7  them?
8      A.  Security guards were harassing me and
9  wouldn't let me be with my dad.
10      Q.  Did you ever have specific visiting hours
11  imposed on you?
12      A.  No.
13      Q.  So you were never told you can only visit
14  him on these days at this time?
15      A.  No.
16      Q.  Were you ever escorted out of the
17  hospital?
18      A.  Yes.
19      Q.  How many occasions?
20      A.  Several.
21      Q.  Why were you escorted out of the hospital
22  on several occasions?
23      A.  They wouldn't tell me.  I asked them, and
24  they wouldn't tell me.  They just said, You know
25  why.

Page 56

1      Q.  And if you need a break, feel free to
2  stop, and we can take a break.  I know this is --
3      MR. POTTER:  Do you want some water?
4      THE WITNESS:  (Witness shakes head.)
5  BY MR. BENSON:
6      Q.  So when you were asked to leave the
7  hospital, they never indicated why?
8      A.  No.  Because they threatened me.  They
9  said we're going to have you arrested.  They
10  wouldn't let me be with my dad.
11      Q.  Did you ever yell at anyone in the
12  hospital?
13      A.  No.
14      Q.  Did you ever use profanity towards anyone
15  in the hospital?
16      A.  No.
17      Q.  Did you ever have a meeting with people
18  in the hospital where Metro showed up?
19      A.  Could you rephrase that?
20      Q.  Did you ever meet with anyone in the
21  hospital where Metro or the police officers were
22  there to keep the peace?
23      A.  Oh March 2nd.
24      Q.  What happened on March 2nd?
25      A.  There was supposed to be a family

1   meeting, and the doctor called a family meeting,
2   and -- because my dad almost died. They put a
3   pacemaker in him. And nobody wanted to talk. They
4   didn't do any tests on him or nothing. They just
5   put it in within him 15 minutes of being there.
6   Supposed to do tests, supposed to do days of testing
7   before you just put pacemakers in, and they didn't.
8        And there's complications, and he almost
9   died from the pacemaker that they shouldn't have put
10  in in the first place because something else was
11  wrong with him. He didn't need a pacemaker. The
12  nurse said probably -- she -- he didn't need a
13  pacemaker. If they would have done tests, they
14  would have known he didn't need a pacemaker.
15       And there was supposed to be a family
16  meeting with the doctor, and I called my brother and
17  told him there is going to be a family meeting at
18  11:00 tomorrow if you want to go. The doctor is
19  going to explain everything. So he says, Okay. So
20  then -- I forgot which brother I told, Lewis or
21  Steve. I don't recall which one I told.
22       And so I was waiting for them. I thought
23  everybody was okay, you know. My father was in the
24  hospital. I was waiting for them in the waiting
25  room there to come out of the elevator. I was

1   waiting for them.
2        And all three of them, my mom and my two
3   brothers, come out of the elevator with two
4   uniformed police officers and the security guards,
5   if I remember correctly, the security guards. The
6   security guards were there. I don't remember if
7   they were in the elevator with them or not. I think
8   they all got out the elevator together.
9        And the security guard and police
10  officers were standing there talking to the security
11  guard. And the security guard said, We're going to
12  have you arrested. The security guards were
13  harassing me.
14       And then the police officer -- me and
15  Lewis got in an argument or something, and then the
16  police officers just -- this is -- if I can recall,
17  this is what happened -- the police officers didn't
18  really -- they were trying to like, let's -- they
19  didn't really know what was going on because they
20  were hearing one thing, me arguing with my brother.
21  This is what I felt. They were arguing -- me
22  arguing with my brother, and then the security
23  guards telling me they are going to have me
24  arrested.
25       Then the one police officer, you know, he

1   approached me, and he just -- he just said, We are
2   just here to keep the peace, that's it. That's all
3   he said. He said, That's all we're here for, just
4   to keep the peace, you know. They didn't really say
5   anything to me.
6        And then we had the family meeting, and
7   the police officers were waiting outside the door.
8   And then Lewis said after the meeting, I'm going to
9   release the police officers. But he wasn't even
10  working, Lewis. He was off duty, and he's not their
11  superior; so he doesn't have -- why should he
12  release them, so -- so that's what happened. Oh --
13       Q.  So the police --
14       A.  -- and okay.
15       Q.  What were you going to say?
16       A.  That's it.
17       Q.  So the police officers came to the
18  March 2nd, 2008 family meeting to keep the peace?
19       A.  That's what they told me they were there
20  for.
21       Q.  Do you know who requested that they come?
22       A.  No, I did not. Lewis did.
23       Q.  Lewis requested that they come?
24       A.  Yes. He's the one that released them.
25  He said he was going to release them. So if he's

1   the one that releases them, then he's the one who
2   requested them.
3        Q.  So your only knowledge on who requested
4   them is the fact that Lewis released them?
5        A.  Yes.
6        Q.  Any other basis on why Lewis requested
7   them other than that?
8        A.  To harass me and maybe to -- that's it.
9   I don't know. I have no clue. I'm clueless.
10       Q.  While your father was hospitalized, was
11  there a larceny ever reported against you?
12       A.  Not that I'm aware of.
13       Q.  Your brother never accused you of
14  stealing his phone?
15       A.  I never received any complaint. A police
16  officer did go into my father's hospital room and
17  question me about that, and it was very brief, and I
18  said it was just me and my dad. My dad was awake at
19  that time, and I said, My dad is very sick. Can you
20  leave? And he just turned around and left and that
21  was it.
22       And I think somebody might have called me
23  on the phone; however, I don't recall. And that was
24  it. That's the only thing I heard about that. I
25  never read a complaint or anything. I've never

1 received a complaint. I've never been arraigned or
2 anything.
3     Q. Did you take your brother's phone?
4     A. No.
5     Q. Now, after March 7th, did you ever refuse
6 to leave the hospital when asked?
7     A. Not that I can recall.
8     Q. Were you ever notified that you were in
9 the hospital during nonvisiting hours?
10     A. I think the girl did say something like
11 that, one of the nurses. And they had 24-hour
12 visiting; so I didn't know what she was talking
13 about.
14     Q. What did you say to her when she told you
15 it wasn't visiting hours?
16     A. I just said -- she said, You're not
17 allowed to be here, I think, and I said, Why not?
18 Visiting hours start at 8:00. They only close one
19 hour out of the 24 hours from, I think it was 7:00
20 to 8:00 or 8:00 to 9:00, if I can remember
21 correctly. And I just got off work. I think I
22 said, It's 10:00 o'clock. So why isn't it visiting
23 hours?
24     And she said, You're not allowed to be
25 here.

1     I said, Why not?
2     And then the next thing I know, security
3 came, and they kicked me out or something, and I
4 don't remember what happened. They kicked me out.
5 They handcuffed me in the parking lot. The police
6 came. They forced me to the ground. The police
7 came. The police acknowledged and seen me in
8 handcuffs.
9     They put in the police logs that he seen
10 me in handcuffs, and PBX seen me in handcuffs, and
11 the police told me, Don't go there again. You come
12 back here, we're going to arrest you. We don't want
13 you here.
14     Q. During that incident, were you agitated?
15     A. I was numb.
16     Q. Did you yell?
17     A. No. I don't remember. I was crying. I
18 was hurt. He hurt me. He was jerking my arm out of
19 my socket. And my arm -- hands were all bruised
20 from the handcuffs.
21     Q. Who is "he"?
22     A. The security guard.
23     Q. Did the officers ever put you in
24 handcuffs?
25     A. Not on the 17th.

1     Q. Not on the 17th? Were you ever
2 trespassed?
3     A. No. Not that I can -- I don't know what
4 that means. That means -- they kicked me out. I
5 don't know if that means trespass, but I was kicked
6 out.
7     Q. Did they ever tell you you were being
8 trespassed?
9     A. They never used that word, "trespassed."
10 They said "arrested." You come back here, we're
11 going to arrest you. We don't want you here. I
12 also -- yeah.
13     Q. So they told you if you came back, you
14 would be arrested?
15     A. Yes. I told him, They are hurting -- my
16 dad needs to be with me. And they became sarcastic.
17 Well, somebody is hurting your dad. You better call
18 the police.
19     Q. Prior to the incident on March 21st, any
20 other problems at the hospital?
21     A. There was. They wouldn't -- they
22 threatened to kick me out the day of my father's
23 operation.
24     Q. What date was that?
25     A. I believe his operation, March 10th.

1 They threatened to kick me out on March 9th.
2     Q. Why were they threatening to kick you
3 out?
4     A. I don't know. They said, You better just
5 sit here and not say anything. He is going to get
6 the operation. I didn't want him to get it. I
7 wanted him to come home because that nurse wouldn't
8 know -- the doctor, one of the other doctors, said,
9 He doesn't have to get it. He can just go home.
10 And I want to take him home, and that doctors wanted
11 to operate.
12     Q. So you didn't want him to have the
13 operation?
14     A. No. I wanted him to come home.
15     Q. Were you upset that they were operating?
16     A. I don't know what I was. I wanted my dad
17 to get better.
18     Q. Were you yelling at anyone because they
19 were operating?
20     A. No, absolutely not. I would never -- I
21 was as calm as can be because I don't want to upset
22 my dad. My dad did not like conflicts. So we were
23 all very quiet around my dad, and I didn't want him
24 to know that anything was going wrong because he
25 would be hurt if he seen the way they were treating

Page 65

1 his children. So I just wanted him to think
2 everything is okay and he's going to get better and
3 come home. I wanted him to heal.
4     Q.  So we have talked about March 2nd,
5 March 7th, March 9th, and March 17th.
6         Any other conflicts at the hospital or
7 problems with the hospital?
8     A.  There was another problem. My brother
9 was there -- actually, both my brothers. I don't
10 recall the date. It was after March 17th. It was
11 between the 17th and the 21st. The one nurse would
12 not let me be there. Nurse Lizbeth Hamilton, she
13 would not let me be with my dad. The other nurses
14 would, but she would not let me be there when she
15 was his nurse.
16         And -- and I think prior to that, my
17 brothers -- both my brothers talked to her, talked
18 to them and said, You know, she should be -- my
19 brothers wanted me there, because they couldn't be
20 there all the time. Lewis had to work, he said, and
21 Steve had his juice bars, and they wanted me there.
22         And they told them at the hospital, Why
23 can't she be here? I don't know what the words they
24 said. I wasn't there. But they said that they
25 called up and they went there in person and they

Page 66

1 told them -- they literally -- my mom was there with
2 them. All three of them literally begged them to
3 let me in. They don't know why they won't let me
4 in. That's the story they told me.
5         And that's what they put in their nurses'
6 notes also, that they were there trying to get me --
7 allow me to be back there. She wouldn't let me be
8 there. And when I wasn't there, when she was his
9 nurse, bad things happened. But when the other ones
10 were his nurse, he got better. She would yell. She
11 said, Stop looking at the monitor. She yelled at
12 all three of us, my mom, my brother Steve. She
13 yelled at us, Stop looking at the monitor, the
14 heartbeat monitor. She yelled at the top of her
15 lungs.
16     Q.  Did you ever yell back at her?
17     A.  No, never.
18     Q.  Were you at the hospital on March 21st,
19 2008?
20     A.  Yes.
21     Q.  And on that date, were there any orders
22 on who could visit your father?
23     A.  Yes.
24     Q.  What was that?
25     A.  Family members only.

Page 67

1     Q.  Where was that order posted?
2     A.  It was posted on his door.
3     Q.  And do you have copies of it?
4     A.  Of the sign, no, not of the actual sign.
5     Q.  Do you have copies of any order to that
6 effect?
7     A.  It's in the doctor's notes, yes.
8     Q.  And do you have those?
9     A.  Not with me.
10     Q.  But you do have them in your possession?
11     A.  Yes.
12     Q.  And who put that order into place?
13     A.  Dr. Rebecca -- I believe it's Dr. Rebecca
14 Sinai, if I remember correctly. It might have been
15 a lead nurse, but I think it was a doctor.
16     Q.  Did there come a time when somebody who
17 wasn't family came into the room?
18     A.  Yes.
19     Q.  And when was that?
20     A.  March 21st.
21     Q.  And tell me what happened.
22     A.  Danielle Pieper along with my brother
23 Steve Zaic came in. I was sitting at the bed, the
24 foot of my father's bed. And they both walked into
25 the room. And I never seen her before. He spoke

Page 68

1 about her, but I've never met her before; so I knew
2 her name. And then -- and I knew what she did for a
3 living.
4         And they came in, and I didn't want
5 anybody to see my dad like that, and I don't think
6 he -- he wouldn't want anybody to see him like that
7 either. I just felt that they were making a freak
8 show out of my dad and she shouldn't be there. He
9 wouldn't want her there. He was incapacitated. He
10 had a breathing tube down his throat, and she should
11 not have been there. Nobody should have been there
12 except his own immediate family members.
13         You know, I even told the nurses. I
14 said, I don't want anybody in here, you know, only
15 family members. And she said, Well, we don't --
16 we're the only hospital in town that has 24-hour
17 visiting, and we allow anybody in. We don't
18 restrict our patients, you know, people from coming
19 in. We're the only hospital in town that does that.
20 That's what she said. So she wouldn't stop her.
21 She allowed her in. They let them in.
22         And I told my brother to have her leave,
23 and I told her to leave, and she wouldn't leave.
24 And the next thing I know, my brother come running
25 after me from the other side of the bed, and I ran

Page 69

1  from him because he was coming after me, and we've
2  been in altercations in the past; so I know my
3  brother, and --
4          MR. POTTER:  You need, just for the
5  record, state which brother so I don't get confused
6  on brothers, your brother.
7          THE WITNESS:  Steve Zaic, and he chased
8  me to the door and tackled me to the ground.  Not
9  tackled me, but I don't know just how he got me down
10  there, but he got me down there real fast like
11  police officers do.  And the nurses came in the
12  room.  They pulled him off of me, and I think -- I
13  don't remember who said it, But the police are on
14  their way or something.  I don't know, and the
15  next -- I was arrested.
16  BY MR. BENSON:
17      Q.  And Danielle Pieper was Steve Zaic's
18  fiancee; correct?
19      A.  That's what he said.
20      Q.  Did you have any reason not to believe
21  him?
22      A.  No.
23      Q.  You had heard about her before?
24      A.  Yes.  Through my father.
25      Q.  What did your father say about her?

Page 70

1      A.  Nothing.
2      Q.  Had he met her before --
3      A.  They went to eat a few times, all three
4  of them, and he didn't say anything.
5      Q.  So your father had been out to eat with
6  her?
7      A.  The three of them.
8      Q.  The three of them being your father,
9  Steve, and Danielle?
10      A.  Yes.
11      Q.  How many times had they gone out to
12  dinner?
13      A.  I don't know.  Three that I know of,
14  maybe, if even that.
15      Q.  What else, if anything, did your father
16  say about Danielle?
17      A.  I don't recall.  He didn't used to say
18  much.  His children are happy, then that's good
19  enough for him.
20      Q.  And was Steve happy?
21      A.  I don't know.  I never discussed Danielle
22  with him.  At that time we were not talking.  I know
23  she's not his type.
24      Q.  So when Danielle, who had been out to
25  dinner with your father, came into the room, what

Page 71

1  was the first thing you said?
2      A.  Who is this?
3      Q.  When Danielle and Steve walked into your
4  father's room, what is the first thing you said to
5  them?
6      A.  I don't remember.  I think I said, Who is
7  this?  Steve, who is this, or who are you?  What are
8  you -- something to that effect.
9      Q.  And what did he respond?
10      A.  This is Danni, my girlfriend.
11      Q.  And what was your response to that?
12      A.  I don't remember the exact wording right
13  now, but I said, She's not allowed here.  Only
14  family members are allowed here in dad's room.
15      Q.  And what was the tone of your voice?
16      A.  Stern.  She's not allowed here.
17      Q.  Did you use any profanity?
18      A.  Not at that time, not during that
19  conversation, no.
20      Q.  Did you later use profanity?
21      A.  Yes.
22      Q.  When?
23      A.  After she would not leave.
24      Q.  What did you say to her?
25      A.  I think I said, Just get out.

Page 72

1      Q.  What prof -- what kind of profanity did
2  you use?
3      A.  I don't recall.
4      Q.  Did you ever tell her to, Get the fuck
5  out of here, you don't belong here?
6      A.  I might have.  Yes, I think I did.
7      Q.  So when they walk in the room --
8      A.  I said that after she wouldn't leave,
9  though.
10      Q.  So when they walk in the room, how far is
11  the entrance of the door to where you are sitting on
12  the bed?
13      A.  At the foot of the bed I was sitting.  I
14  was sitting in the chair at the foot of the bed.
15  Approximately 20 feet, maybe.
16      Q.  And when they walked in, did they always
17  stay near the door?
18      A.  They weren't near the door, no.  The door
19  was on the other side.
20      Q.  So they walked to the other side of the
21  room?
22      A.  They walked to my dad's bed, which was on
23  the -- near the end of the room.
24      Q.  So when they walked to your dad's bed,
25  were they standing by his bedside?

1    A.  Danielle was on one side and Steve was on
2  the other.
3    Q.  So was it Steve or Danielle that walked
4  by you to get to the other side of the bed?
5    A.  Steve.
6    Q.  So Steve was on the far side of the bed
7  from the door?
8    A.  Inside.
9    Q.  And Danni was on the side of the bed
10  closest to the door?
11    A.  Yes.
12    Q.  And what did they -- what did you say at
13  that point?  Did you ever get up?
14    A.  Yes.  As soon as they walked in the door,
15  I stood up.
16    Q.  Okay.  And then you asked them to leave?
17    A.  Yes.  No, I asked Danielle to leave, not
18  my brother.  Because my dad would want him there
19  most definitely.  I asked her to leave.
20    Q.  So you asked Danielle to leave, and they
21  refused?
22    A.  Yes.
23    Q.  And then they walked to his bedside?
24    A.  No.  They were already there.
25    Q.  So they kind of walked in right to his

1  bedside as you were telling them to get out?
2    A.  Steve walked past me to one side, and
3  Danielle stood at the other side.
4    Q.  During this time did you --
5    A.  As I remember, I think -- I think that's
6  what happened, how they were standing.
7    Q.  During this time did you ever move
8  towards Danielle?
9    A.  We were -- we were close enough to talk.
10  No, no.
11    Q.  Did you ever yell at Danielle?
12    A.  I yelled at her.  I told her to leave.
13  When she wouldn't leave, I had to raise my voice
14  trying to get her to leave.
15    Q.  Did you ever point your finger in her
16  face?
17    A.  No.
18    Q.  Did you ever touch her?
19    A.  No.
20    Q.  At what point did you decide to leave the
21  room or run to the other side of the room?
22    A.  When I seen Steve running after me.
23    Q.  And why was Steve running after you?
24    A.  He yelled something at me.  He was
25  yelling at me because I was yelling at Danielle,

1  telling her to leave.  So my brother stepped in,
2  started yelling at me.  And then I seen him.  He was
3  going to start coming from -- running after me; so I
4  ran.
5    Q.  And you indicated he chased you?
6    A.  Yes.
7    Q.  And he put you down on the ground like a
8  police officer would?
9    A.  Yes.
10    Q.  From the time they entered the room --
11  they being Steve and Danielle -- until he put you on
12  the ground, how much time had passed?
13    A.  Can you repeat that?
14    Q.  How long were they in the room until he
15  put you on the ground?
16    A.  I don't recall.  It was less than -- less
17  than -- less than five minutes.
18    Q.  Could it have been less than three
19  minutes?
20    A.  No.  I don't recall.
21    Q.  So somewhere up to five minutes --
22    A.  It all happened really fast.  Maybe,
23  yeah, it happened real fast as soon as they walked
24  in.
25    Q.  Once he put you on the ground, what

1  happened next?
2    A.  The nurses came.
3    Q.  What did the nurses --
4    A.  He had my hair, my hair.
5    Q.  What did the nurses do?
6    A.  They pulled him off of me.
7    Q.  So the nurses pulled --
8    A.  Steve off of me.
9    Q.  And then what happened next?
10    A.  Then the nurses just walked out as if
11  nothing happened, and then --
12    Q.  When the nurses walked out, did Steve and
13  Danielle leave the room?
14    A.  They left the room also.  Everybody left
15  the room, and I stayed.  And I wanted to be with my
16  dad.  And I looked at my dad, and I was just like in
17  shock that this all happened in front of my dad.
18  And then my dad was incapacitated and he was out of
19  it; so I was thinking, well, hopefully he didn't --
20  I don't know if he seen any of this because he's
21  not -- he's sick.  He's not well.  He wasn't awake.
22    Q.  Did --
23    A.  And then -- go ahead.
24    Q.  Go ahead, you had something to say?
25    A.  No.  I'm done.

1     Q.  So after everyone left, how long was it
2  before somebody else came into the room?
3     A.  There was immediately a girl, or maybe it
4  had been a few minutes, maybe, another nurse just
5  came in there and she just pretended that nothing
6  happened.
7     Q.  Did security ever come in?
8     A.  They came in.  They -- I think -- yes,
9  they came in.
10    Q.  How many security guards came in?
11    A.  There was two.
12    Q.  Do you recall their names?
13    A.  I don't recall.
14    Q.  What did the two security officers say to
15 you?
16    A.  They were banging on their handcuffs
17 and -- actually, they were waiting outside,
18 actually.
19    Q.  So they never came into the room?
20    A.  No.  I think they did.  They did.  They
21 came in.
22    Q.  What did they say to you when they came
23 in?
24    A.  I don't recall.
25    Q.  Did they tell you you had to leave?

1     A.  I don't recall.  But I started leaving.
2  I was walking towards the elevator, and they were
3  following really close behind me, and they were
4  almost brushing up against me.  And I turned around,
5  and I asked them -- I think I said, Was there
6  something wrong, or can I help you?  You know what
7  you did or something, or something to that effect.
8  We're going to have you arrested, or you're going to
9  be arrested.
10    And I went in the elevator, and they
11 followed me in there, and then I walked out.  I
12 didn't want to be in there with them alone.  And I
13 walked into my father's room, and I called 911.  I
14 can't remember if I called 911 or my brother first.
15    Q.  Which brother?
16    A.  Lewis.
17    Q.  So you decided to leave the room without
18 being told to leave?
19    A.  I don't recall.  I think they said that
20 the police were on their way.
21    Q.  And --
22    A.  I wanted my father to get his rest.
23    Q.  And when you walked towards the elevator,
24 the security guards followed you?
25    A.  I think Julie, a Nurse Julie told me the

1  police were on their way or something.  And she said
2  just tell them you want to leave.
3     Q.  Okay.  And this was before you started
4  walking towards the elevator?
5     A.  I don't recall.
6     Q.  At what point did Julie tell you the
7  police were on their way?
8     A.  I don't recall.
9     Q.  So you are in --
10    A.  I think I was crying, and I told Julie,
11 They're going to have me arrested because the
12 security guard said if I come back here one more
13 time, I'm going to be arrested.  And the police said
14 if I come here again, they're going to arrest me.
15 On the 17th the police said, If you come here again,
16 we're going to arrest you.
17    Q.  Okay.
18    A.  So -- and I was crying.  She goes, They
19 can't arrest you.  You didn't do nothing wrong.
20 Just tell them you want to leave.  You just say can
21 I leave, and then they will let you go.  So I said
22 okay.  She goes, I know this.  I'm a nurse.  I see
23 this stuff all the time.  You just tell them you
24 want to leave when they get here.  That's what she
25 said to me.

1     Q.  Who is Julie?
2     A.  I think that was her name.  She was a
3  nurse.  I don't even -- she was one of the nurses.
4     Q.  Was she one of the first nurses that
5  walked in before --
6     A.  I don't even --
7     Q.  -- after the incident?
8     A.  I don't recall, no.  Jane Thiessen was
9  the nurse, my father's nurse that night.
10    Q.  Okay.  Just so we're clear --
11    A.  I think she was the nurse that came in,
12 and Julie came in to help me.  She wasn't my -- I
13 don't think she was my father's nurse.  I don't
14 know.  Jane Thiessen was.
15    Q.  Just so we're clear, I want to make sure.
16 After the incident where you're on the ground, the
17 nurses come in, take your brother off, and then
18 everybody leaves the room and you are in there by
19 yourself.  And you indicated a nurse walked in, was
20 the first person in the room after that incident.
21    What was that nurse's name?
22    A.  Jane Thiessen.
23    Q.  So that was Jane.  And then while you are
24 in there with Jane, you see security guards outside
25 the door?

Page 81

1    A.  Yes.
2    Q.  And at what point do you decide to leave
3 the room?
4    A.  I don't recall, but it was within a
5 matter of minutes after that.
6    Q.  But nobody else had come into the room
7 besides Jane?
8    A.  I don't recall.  Julie came in the room.
9 There was -- Julie came into the room, to help me,
10 to console me.
11    Q.  So Julie came into the room before you
12 ever left it after the incident?
13    A.  I don't remember if she came in there
14 after I went back into the room, after the security
15 guards followed me out, or it was before I left the
16 room.
17    Q.  So the security guards -- so you decide
18 to leave the room.  The security guards follow you
19 to the elevator?
20    A.  Yes.
21    Q.  Do they touch you?
22    A.  Yes.
23    Q.  How did they touch you?
24    A.  They brushed really close against me.
25 And they were walking really close on me.

Page 82

1    Q.  So their shoulder touched you?
2    A.  Yes.  Like -- I guess so, the shoulder.
3    Q.  Did they grab you?
4    A.  I don't recall.
5    Q.  Did they hit you?
6    A.  Not on the 21st.  On the 17th they did.
7    Q.  So on the 21st they didn't hit you?
8    A.  (Witness shakes head.)
9    Q.  Did they put handcuffs on you?
10    A.  On the 21st --
11    Q.  Yes.
12    A.  I don't recall.
13    Q.  So are you -- why do you leave the
14 elevator and go back to the room?
15    A.  Because they were threatening me.  And
16 they were banging their handcuffs, and they were
17 telling me they're going to have me arrested, and
18 they were speaking monotone, and they wouldn't
19 answer questions.  I asked them why they're
20 following me throughout the place.  First I went
21 to -- they're following me through the whole place.
22    Q.  How did they threaten you?
23    A.  They told me they were going to have me
24 arrested.
25    Q.  Any other threats?

Page 83

1    A.  Not that I can recall, not on that day.
2    Q.  And so you returned to the room; is that
3 correct?
4    A.  Yes.
5    Q.  Is there anybody in the room besides your
6 father when you enter?
7    A.  I can't recall.  No, I don't think
8 anybody was, not at that time.
9    Q.  After you returned back to the room, who
10 is the next person that comes into the room?
11    A.  Security guards along with the police.
12    Q.  So after you returned to the room, the
13 next people to enter are the security guards and the
14 police?
15    A.  Yes.
16    Q.  And what do they say to you?
17    A.  They all came in together.  The police
18 started -- they started yelling at me, telling me --
19 I don't know what he said.  They don't want you
20 here, and he was speaking really super loud.
21    Q.  Go back a minute.
22       Did you ever call the police?
23    A.  Yes, I did.
24    Q.  And when did you call the police?
25    A.  After I left the elevator.

Page 84

1    Q.  So you returned back to your room and
2 called the police after --
3    A.  Yes.
4    Q.  -- leaving the elevator?
5    A.  Yes.
6    Q.  What police officer showed up?  Do you
7 recall his name?
8    A.  Frederick.
9    Q.  And what did he look like?
10    A.  Frederick showed up in the room, but
11 Eager was also there.  A tall, thin guy.
12    Q.  Officer --
13    A.  White guy, blond guy.
14    Q.  How many officers came to your room,
15 police officers?
16    A.  There was one.
17    Q.  Just one at that time?
18    A.  That's what I can remember.
19    Q.  And did he ask --
20    A.  There might have been another one, but I
21 didn't -- don't remember seeing him.
22    Q.  Did Officer Frederick ask you to leave
23 the hospital?
24    A.  Yes.
25    Q.  When he walked in, did you say anything

21 (Pages 81 to 84)

1  to Officer Frederick?
2      A.  I think I was in shock.  I think I just
3  told him -- I didn't know what to think, no.  I
4  don't recall saying anything.
5      Q.  Did you comply with his request for you
6  to leave?
7      A.  I think I said why.
8      Q.  What did he say to you?
9      A.  I think he said, They don't want you here
10  or something.
11      Q.  Did you comply with Officer Frederick's
12  request for you to leave?
13      A.  Yes.
14      Q.  So when you left the room, did you go
15  straight outside?
16      A.  Well, actually, he didn't -- he wasn't --
17  he didn't tell me to leave.  A nurse came in because
18  he was talking so loud yelling at me, you know.  He
19  was yelling.  And the nurse -- the nurse said -- she
20  started yelling at the police officer and said, Can
21  you keep it down?  I have a patient in the next
22  room, and then she shook her head like, What is
23  this, what are they doing.
24          Well, that bothered me.  I was thinking
25  what about my dad.  He's a patient also.  Where's my

1  dad's nurse?  There's no nurse here to tend for my
2  dad, to tell my dad, you know, to tell them to keep
3  it quiet, that my dad needs his rest also.
4          So then he walked out.  And then so right
5  outside, I see a room.  He starts reading me the
6  trespassing card again.
7      Q.  What do you mean "again"?
8      A.  I think he said -- he did it in my dad's
9  ICU room.
10      Q.  That same day?
11      A.  I think, yeah.  I think, if I remember
12  correctly.  So then he starts reading it again.  I
13  don't think he really knew what -- I don't know.  He
14  read it outside again, and then he said come with
15  me, and then we went downstairs and he read it
16  again.
17      Q.  So for a third time he read it to you?
18      A.  Yeah.
19      Q.  Were you outside or inside the hospital
20  the third time?
21      A.  Outside, right outside the front door.
22      Q.  So from the time Officer Frederick first
23  showed up until you exited the hospital, did
24  Officer Frederick ever touch you?
25      A.  I don't recall.

1      Q.  So once outside, what discussions do you
2  have with Officer Frederick?
3      A.  Nothing.  He just told me to wait here,
4  and then he went and talked to my brother and
5  Danielle.  I told him, Can I leave?  And he says,
6  No, not until I'm done.  You wait here.  And then
7  he -- because Julie told me just tell him I want to
8  leave.  She told me what to say and so I said it.  I
9  said, Can I leave?  And he wouldn't let me leave.
10  He made me sit there on the bench, and he went to
11  talk to both Danielle and my brother.  And then they
12  came back, and they arrested me.
13      Q.  When did Officer Eager show up?
14      A.  He put me in handcuffs and he arrested
15  me.  I think he was there.  I seen him.  He was
16  there as soon as we walked out the hospital.
17      Q.  Did you ever talk to Officer Eager?
18      A.  No, never.
19      Q.  Did Officer Eager ever touch you?
20      A.  No.  I never spoke to him.  He never
21  touched me.
22      Q.  Officer Frederick, you indicated, after
23  speaking with your brother and Danielle, came over
24  to you and arrested you; is that correct?
25      A.  Repeat.

1      Q.  After Officer Frederick was speaking with
2  your brother and Danielle, you indicated he came
3  over and arrested you and handcuffed you; is that
4  correct?
5      A.  Yes.  That other guy, Eager --
6      Q.  Yes.
7      A.  -- he was never -- I don't know, he never
8  got so -- as close to me.  He never spoke to me.  He
9  never even got really close.  He was very distant,
10  way on the other side.  So he doesn't even know what
11  I looked like, as far as I'm concerned, because he
12  never was close enough to even see who I am.
13      Q.  So Officer Frederick put you in
14  handcuffs.  Describe how he put you in handcuffs?
15      A.  He patted me down and put me in
16  handcuffs.  He handcuffed my hands behind my back.
17  He put me in the back of the police car.
18      Q.  But the handcuffing didn't cause any
19  injuries; correct?
20      A.  Well, yeah, it hurt.
21      Q.  But you didn't receive any injuries;
22  correct?
23      A.  I received emotional injuries, yes.  And
24  yes, it was bruised.
25      Q.  Do you have pictures of the bruises?

Page 89

1    A.  No.
2    Q.  Did you go see a doctor for the bruising?
3    A.  No.  I didn't have insurance.  My father
4  was the only thing on my mind at that time, not me.
5  I wouldn't go to a doctor just of a bruise.
6    Q.  Did any of the officers hit you?
7    A.  They handcuffed me.
8    Q.  Did they ever hit you?
9    A.  No.  Explain "hit."
10    Q.  What do you understand "hit" to mean?
11    A.  Punch.
12    Q.  Did they ever punch you --
13    A.  Closed fist.
14    Q.  -- with a closed fist?
15    A.  No.
16    Q.  Did they ever kick you?
17    A.  No.
18    Q.  Did they ever slap you?
19    A.  No.
20    Q.  Did they ever pull a weapon out?
21    A.  I don't recall.
22    Q.  Did they ever Tase you?
23    A.  No.
24    Q.  Did the officer use any weapons in his
25  tool belt or any of his tools besides his handcuffs?

Page 90

1    A.  I don't recall.
2    Q.  Do you ever -- did you ever voice any
3  complaints to the officers?
4    A.  Yes.
5    Q.  What complaints?
6    A.  I told him, My dad is up there in the
7  hospital room and he expects me to be there with
8  him, and he is going to be very -- he's going to
9  wonder why I'm not there.  He's going to be sad.
10    Q.  Any other complaints?
11    A.  I told the officers that the security
12  guards are harassing me.  They won't let me be with
13  my dad.
14    Q.  Any other complaints?
15    A.  Not that I can recall.
16    Q.  So the only complaints you ever voiced to
17  the officers was your dad was upstairs and he needed
18  you and you wanted to be there and the security
19  guards were harassing you; is that correct?
20    A.  That I can recall.
21    Q.  Did you ever complain about the
22  handcuffs?
23    A.  Yes.
24    Q.  What did you complain about them?
25    A.  They're too tight and it hurts, and I

Page 91

1  think my arm is broke.  He pulled it out of the
2  socket.
3    Q.  You complained that your arm was broke?
4    A.  I said, I think my arm is broke.
5    Q.  This was on March 21st; correct?
6    A.  This was on March 17th.
7    Q.  Okay.  We're talking about March -- let's
8  go to March 21st.
9        The handcuffing on March 21st, did you
10  ever voice any complaints about the handcuffing on
11  that day?
12    A.  Yes.
13    Q.  What did you say?
14    A.  I think I said, if I can recall, I don't
15  know the exact words, but I think I said -- I just
16  was annoyed that he kept me in the car for
17  45 minutes.  I don't think he had to handcuff me
18  until after -- until right -- until he was about
19  ready to take me to -- you know, drive me there.  He
20  didn't have to keep me in handcuffs for 45 minutes.
21    Q.  So on March 21st, are there any other
22  complaints besides he kept you in handcuffs too
23  long?
24    A.  They wouldn't let me be with my dad.  I
25  had a right to be there.  I hadn't -- I told them I

Page 92

1  have a right to be here.  My dad is expecting me to
2  be here.  He's very sick.
3    Q.  Now, going back to the March 17th when
4  you said you complained they were too tight, the
5  handcuffs were too tight, and that you felt your arm
6  was broke, that was from handcuffing by security
7  guards; correct?
8    A.  Yes.
9    Q.  So on the March 21st handcuffing with the
10  police, you never complained that they were too
11  tight; correct?
12    A.  I don't recall.
13    Q.  Have you ever seen your complaint that
14  you filed in this action?
15    A.  Yes.
16    Q.  Did you review it before it was filed?
17    A.  I don't recall.
18    Q.  Have you read it since it was filed?
19    A.  Yes.
20    Q.  Do you approve of everything that is in
21  it?
22    A.  Yes.
23    Q.  Now, what violations of your civil rights
24  do you allege LVMPD committed?
25      MR. POTTER:  Objection; calls for a legal

Page 93

1 conclusion.
2     Go ahead, if you can answer.
3     THE WITNESS: The police officers did not
4 have probable cause to arrest me.
5     Did you say go ahead?
6     MR. POTTER: Yeah. You can go ahead and
7 answer his question.
8 BY MR. BENSON:
9     Q. What do you mean they had no probable
10 cause to arrest you?
11     A. They didn't talk to me first. They
12 wouldn't let -- nothing I said mattered. They
13 turned a blind eye to me. They already had -- they
14 were convinced that they were going to have --
15 whatever Danielle said went. They didn't care why I
16 was there.
17     They said they don't have any
18 jurisdiction over the hospital, and that's it. They
19 said if the hospital wants me out, then I'm out.
20 That's their private property, and they don't have
21 any say over the hospitals. That's what they told
22 me.
23     Q. Before they put you in the police car and
24 took you away from the hospital, you did voice
25 complaints about security guards harassing you;

Page 94

1 correct?
2     A. I don't recall.
3     Q. Earlier when we were talking about your
4 complaints that you told the police --
5     A. That was on the 17th. We were talking
6 about the 17th.
7     Q. Okay. So on the 21st --
8     A. I voiced that on the 17th.
9     Q. On the 21st, did you ever voice any
10 complaints to the police about the security guards?
11     A. I don't recall. He didn't speak to me.
12 He didn't ask -- I wasn't allowed to speak to him.
13 He told me, Just sit here and don't say anything.
14 So no, I wasn't allowed to talk to him. He didn't
15 ask me any questions. On the 17th I did, though. I
16 remember that, specifically.
17     Q. But this lawsuit doesn't involve anything
18 that happened on the 17th; correct?
19     MR. POTTER: Objection; calls for a legal
20 conclusion.
21     THE WITNESS: I think it does.
22 BY MR. BENSON:
23     Q. It does?
24     A. It leads up to it.
25     Q. But you are not suing over actions that

Page 95

1 took place on March 17th, 2008; is that correct?
2     A. I am. In my mind, it happened. March
3 17th happened. The complaint
4 doesn't specify it, but it does lead up to it, that
5 there was a previous harassment issue.
6     MR. POTTER: Is this a good time to take
7 a break?
8     MR. BENSON: Great time to take a break.
9     (Off the record.)
10 BY MR. BENSON:
11     Q. Welcome back, Ms. Zaic. Just got back
12 from a lunch break, and you understand you are still
13 under oath; correct?
14     A. Yes.
15     Q. Earlier you had stated that your brother
16 Steve had beat you up in the past before and after
17 this incident.
18     How many times has your brother Steve
19 beat you up?
20     A. Twice.
21     Q. And when were those?
22     MR. POTTER: Just what she has testified
23 to?
24 BY MR. BENSON:
25     Q. On what two occasions has your brother

Page 96

1 beat you up?
2     A. We got in an argument. Actually, he
3 didn't beat me up. He chased me around the house
4 and threatened me. It was about four years prior to
5 that.
6     Q. And what was the other time?
7     A. The day, March 23rd. I think that was my
8 dad passed away.
9     Q. What happened on March 23rd?
10     A. He and Lewis came to my house. And
11 actually, he didn't physically hurt me. Lewis, they
12 attacked me. And the police have pictures of that
13 incident.
14     Q. Did Steve hit you?
15     A. No.
16     Q. Did he cut you?
17     A. No.
18     Q. Did he beat you up on March 23rd?
19     A. No. Lewis did.
20     Q. And then before, about four years prior
21 to this incident, you indicated that you were in an
22 argument and he chased you around the house.
23     Did he ever touch you on that date?
24     A. I don't remember.
25     Q. In your interrogatories you state, I

24 (Pages 93 to 96)

Page 97

1  started running towards -- this is when you were in
2  the hospital. You said, I started running towards
3  the door, as I knew my brother was going to beat me
4  up, as he has done in the past on several other
5  occasions prior to this incident and after this
6  incident.
7      A. Right.
8      Q. So were you referring just to these two
9  occasions?
10     A. Yes.
11     Q. And you indicated he never touched you on
12 either of those two occasions?
13     A. Well, he's -- I don't know who was there.
14 I don't know who physically -- Lewis was there.
15 Lewis specifically did that.
16     Q. But Steve never did?
17     A. He did four years prior to that.
18     Q. Earlier you just testified that the four
19 years prior you had an argument, but he never
20 touched you.
21     A. Well, it was a long time ago.
22     Q. So did he touch you or did he not touch
23 you?
24     A. I don't remember.
25     Q. So what did you mean when you answered in

Page 98

1  this interrogatory, Like he has done in the past on
2  several occasions prior to the incident and after
3  the incident, that he had beat you up?
4      A. I was referring to that incident four
5  years prior.
6      Q. Just one? Just one incident?
7      A. And the other one where he was physically
8  there on the 23rd.
9      Q. But on those two occasions, he either --
10     A. I lumped both of my brothers into one.
11     Q. -- so he either didn't touch you or you
12 don't recall; is that correct?
13         MR. POTTER: Objection; argumentative.
14         THE WITNESS: The police were called four
15 years prior to that.
16 BY MR. BENSON:
17     Q. But you don't recall if he touched you
18 four years prior; is that correct?
19     A. I think he did. He chased me into the
20 room, and I think he did. He did.
21     Q. How did he touch you?
22     A. He grabbed the -- he grabbed the stun gun
23 out of my hand.
24     Q. And then what?
25     A. I don't recall.

Page 99

1      Q. Did he use it on you --
2      A. He just came. No.
3      Q. Did he hit you?
4      A. No.
5      Q. Did he push you?
6      A. No.
7      Q. Did he beat you up?
8      A. No.
9      Q. You indicated that you have suffered
10 emotional distress as a result of this incident; is
11 that correct?
12     A. Yes.
13     Q. Have you ever visited a doctor?
14     A. Not because of this, no.
15     Q. Have you -- have you ever been prescribed
16 medication because of this incident?
17     A. No.
18     Q. Have you ever lost sleep?
19     A. Yes.
20     Q. Do you regularly lose sleep over this
21 incident?
22     A. Yes.
23     Q. What other emotional distress have you
24 suffered?
25     A. The loss of my father. He'll never be

Page 100

1  here.
2      Q. But you've never visited a doctor, been
3  prescribed medication?
4      A. No.
5      Q. Are you involved in any other civil
6  lawsuits right now?
7      A. No. Not that I -- no.
8      Q. So this is the only civil lawsuit you are
9  involved in?
10     A. Yes.
11     Q. Are you a defendant in any case?
12     A. No.
13         MR. POTTER: A defendant other than in
14 the case we've talked about?
15 BY MR. BENSON:
16     Q. Correct. A defendant in any other civil
17 case?
18     A. No.
19     Q. Is there anything that you feel is
20 important to this case that we have not discussed so
21 far?
22         MR. POTTER: Objection; calls for a
23 narrative.
24         THE WITNESS: No.
25         MR. BENSON: I'm done. I will pass the

25 (Pages 97 to 100)

CAMEO KAYSER & ASSOCIATES (702) 655-5092

1  witness.
2       EXAMINATION
3  BY MR. TYLER:
4       Q.  Hi Joyce, my name is Casey Tyler.  I
5  represent the hospital and the security guard in
6  this matter.  Because of the nature of this process,
7  I'm going to be asking you follow-up questions; so I
8  may have to jump around a little bit.  Some of the
9  things we have already talked about, but I may have
10 more specific questions and maybe questions in a
11 different light as to that area of inquiry.
12      Do you have any questions about that
13 before I proceed?
14      A.  No.
15      Q.  Counsel has already asked you if you
16 actually spoke with anybody in preparation for
17 today.
18      Did you actually review any materials,
19 though?
20      A.  Repeat that.
21      Q.  Did you review any kind of materials in
22 preparation for today's deposition?
23      A.  No.  Not today, no.
24      Q.  Or at any point during the last week or
25 so in preparation?

1       A.  Yes.
2       Q.  And what did you review?
3       A.  What's going to be -- what's going to
4  happen today.  What can I expect, how the wording --
5  how you guys are going to -- I just had to watch a
6  movie.
7       Q.  And I don't want to know about what you
8  talked about with Cal about how the process is going
9  to work, but is there actually any written materials
10 that you reviewed in preparation?
11      A.  My complaint.
12      Q.  Your complaint.
13      Did you review any of the interrogatories
14 or discovery responses?
15      A.  Yes.
16      Q.  Any of the other legal pleadings?
17      A.  Yes.
18      Q.  To the best of your knowledge, could you
19 give me an idea of what you did review?
20      A.  My own interrogatories, the complaint,
21 and a few of the motions that you filed in response
22 to the complaint.
23      Q.  Anything else?
24      A.  No.
25      Q.  Did you keep any kind of written diary or

1  did you make any kind of written reports on your own
2  about the incident that occurred at MountainView
3  during any of that time frame while your dad was in
4  the hospital?
5       A.  Yes.
6       Q.  And what did you keep, or what did you
7  diary, or what kind of reports did you create?
8       A.  Handwritten and some computer notes, I
9  believe, and also recordings.
10      Q.  And the handwritten and computer notes,
11 are those still accessible to you?
12      A.  No.
13      Q.  And why is that?
14      A.  On the police -- Nevada Highway -- the
15 Department of Public Safety came in and took them.
16      Q.  And what is your understanding of why the
17 Department of Public Safety took those notes?
18      MR. POTTER:  Object to the extent it
19 calls for her knowledge of what is going on in the
20 criminal action and instruct her not to answer.
21 BY MR. TYLER:
22      Q.  And the notes taken by the Department of
23 Public Safety, do those notes include information
24 regarding the incidents that occurred at
25 MountainView Hospital?

1       A.  Yes.
2       Q.  And as far as you know, any backups, any
3  copies, anything like that, everything would be in
4  possession of the Department of Public Safety?
5       A.  Yes.
6       Q.  Are there any narratives that you created
7  like that that you provided to Mr. Potter?
8       A.  No.  I don't have them, no.
9       Q.  Any other narratives, diaries, things of
10 that nature that you created on your own that are
11 still accessible to you?
12      A.  No.
13      Q.  As far as your legal history, have you
14 ever had a lawsuit filed against you or filed a
15 lawsuit against anyone else?
16      A.  Let me go backwards, not that I can
17 recall the notes.
18      Q.  The notes that were created about the
19 incident?
20      A.  Right, not that I can recall.
21      Q.  So there may be more that are floating
22 out there, you are just not sure?
23      A.  Right.  I may have some in my house or
24 something.
25      Q.  Is that something that you could check

Page 105

1  on, and if you were able to find those, you could
2  provide those to Mr. Potter and he could produce
3  those?
4      A.  If I find them, correct, if they are
5  there.
6      Q.  Would you be willing to look for those?
7      A.  Yes.
8      Q.  Thanks.
9      A.  There's some -- okay.
10     Q.  Have you ever been involved in any kind
11  of legal actions prior to the incident in question?
12     A.  Yes.
13     Q.  And what are those?
14     A.  What type of legal actions?  Sorry.
15     Q.  Any type of legal action where there was
16  actually litigation filed in a court, so a complaint
17  or anything of that nature --
18     A.  You are talking about civil?
19     Q.  Civil or criminal, either against you or
20  by you?
21     A.  Can you repeat what -- prior to this
22  complaint or after, I was arrested for wiretapping
23  by Danielle Pieper, the one we're suing.  She's
24  involved with that.  And that's a felony charge.  I
25  was arrested for that.

Page 106

1         And I was involved -- I was a defendant
2  in a civil lawsuit from -- over an Internet dispute,
3  somebody that lives in Maine.  That case is closed.
4  I'm no longer a defendant.
5      Q.  Any other lawsuits besides those where
6  you have been a plaintiff or a defendant?
7      A.  Not that I can recall.
8      Q.  I'm going to show you Exhibit B.
9         (Whereupon, Exhibit B was
10        marked for identification.)
11  BY MR. TYLER:
12     Q.  And you mentioned a civil lawsuit where
13  you were a defendant over an Internet transgression.
14        Is this an order issued from that suit,
15  as far as you can tell?
16     A.  Yes.
17     Q.  And if you can -- and if you need to,
18  feel free to take a look through that to refresh
19  your memory.
20        Can you tell us, to the best of your
21  recollection, what the basic facts of that lawsuit
22  were.
23        MR. POTTER:  I'll just object and a
24  continuing objection on relevancy.
25        Go ahead and answer.

Page 107

1         THE WITNESS:  I purchased some health
2  food products from a girl that has an Internet
3  business.  I purchased a book and a small appliance,
4  over $80, and wrote her a check and sent it in, she
5  never gave me my product and she cashed my check.
6  And I called her up and requested it, and she never
7  gave it.
8         I went on the Internet and voiced my
9  opinion on a health food forum that we both
10  frequent, and similar to how they do on eBay and
11  Amazon, when you purchase a product, you can voice
12  your opinion and feedback.  And I posted my
13  feedback, and she sued me.  She didn't like what I
14  wrote.
15  BY MR. TYLER:
16     Q.  And in the body of your order, I'm
17  looking at the second page of that, and it says,
18  quote, Some of the claims allegedly made by Zaic
19  were that Cohen stole $100 from a young girl and
20  threatened her, that she threatened a customer's
21  life, and that she acted fraudulently by cashing a
22  check and not delivering an ordered product.
23        Did you ever make those claims?
24     A.  Yes, she did that.
25     Q.  She made those claims or you made those

Page 108

1  claims?
2      A.  I did criticize her business.  I made
3  those claims.
4      Q.  And did she actually threaten your life?
5      A.  They threatened me.
6      Q.  And how did they do so?
7      A.  I don't recall.  The case is closed,
8  so -- her husband threatened me.
9      Q.  Threatened physical violence against you?
10     A.  Yes.  An employee of hers.
11     Q.  You looked earlier at Exhibit A -- I
12  don't have the original -- and I know you don't
13  necessarily know if there is any merit to the
14  charges that have been made against you, and I don't
15  want you to comment on that at all.
16        But to the best of your understanding,
17  are these the charges that have actually been
18  leveled against you in that litigation?
19     A.  This is what I'm being accused of.
20     Q.  As far as you know, that's the full
21  extent of the charges that are currently pending
22  against you?
23     A.  As far as I'm aware and my public --
24  nobody never sat down and discussed this with me; so
25  I don't know.

27 (Pages 105 to 108)

Page 109

1        MR. POTTER: I'm going to instruct you,
2  don't get into conversations with -- about the
3  attorneys.
4  BY MR. TYLER:
5        Q. And my only question is just as far as
6  you know, these are the actual felony charges that
7  are pending against you; is that correct?
8        A. Correct.
9        Q. Have you ever been diagnosed with any
10  type of mental illness?
11        A. No.
12        Q. Have you ever taken any type of
13  medication?
14        A. No.
15        Q. Were you on any type of prescriptions at
16  the time your father was a patient at MountainView?
17        A. No.
18        Q. Have you ever been on any kind of
19  medication that would be for any kind of mental
20  issue?
21        A. No.
22        Q. In this matter your counsel has produced
23  what is called the 26.1 disclosure of witnesses and
24  documents. I don't know if you took part in
25  creating this, but this lists who you would

Page 110

1  potentially call at trial. I just have a few
2  questions about what -- who some people are and what
3  their roles might be in the potential trial.
4        You listed Courtney Cerna as an operator
5  for MountainView Hospital, and you listed that
6  person is expected to testify regarding her
7  knowledge of the facts and circumstances before or
8  after surrounding the subject incident.
9        What is your understanding of what
10  Courtney Cerna may or may not know in regards to
11  this litigation?
12        A. She is the PBX operator?
13        Q. I'm not sure. This is your disclosure.
14        A. My attorney drafted that. I don't know.
15        Q. Let's assume that she is the PBX
16  operator, you're correct in that deduction.
17        What is your understanding of what her
18  role could potentially be in this litigation?
19        A. She can -- my attorney drafted that. We
20  discussed -- he drafted that.
21        Q. Is there anything -- any testimony you
22  intend to introduce at trial about the role of the
23  PBX operator in your efforts to prove your cause of
24  action?
25        A. The PBX operator --

Page 111

1        MR. POTTER: I will object to the form of
2  the question. She is not trying the case. I mean,
3  she can testify to facts.
4        You can testify factually of what you
5  know.
6        THE WITNESS: The PBX operator took the
7  call or is the one that called the police after the
8  security guards told her to. The PBX operator
9  stated to the police in the 911 call that she seen
10  me in handcuffs.
11  BY MR. TYLER:
12        Q. As far as you personally know, would the
13  PBX operator have any more information regarding the
14  incident that occurred at MountainView?
15        A. Not that I'm aware of. She might.
16        Q. You've listed a number of medical
17  witnesses, and there's 20 total. And I will let you
18  browse through those. They are under Section D
19  here. It appears that they are all medical
20  providers that were providing care for your father.
21        And really, my only question is do you
22  intend to use any of those medical providers to
23  provide testimony about any injuries that you may
24  have sustained as a result of the incidents at
25  MountainView?

Page 112

1        MR. POTTER: To the extent it calls for
2  any attorney/client privilege, I object.
3        THE WITNESS: My attorney drafted this
4  and -- all of them.
5  BY MR. TYLER:
6        Q. All of them? I'm asking if they treated
7  you personally for any injuries?
8        A. Oh, is that what your question is? Did
9  they treat me?
10        Q. Yes.
11        A. Nobody, no.
12        Q. And you don't intend to introduce any
13  testimony about any of them treating you for any
14  injuries that were sustained at MountainView?
15        A. They treated my father for injuries. All
16  these are my father's.
17        Q. Can I get that back, please?
18        And then you also list a John Parris,
19  address unknown, and they're to testify regarding
20  the knowledge -- knowledge of the facts and
21  circumstances surrounding the subject incident.
22        Who is John Parris?
23        A. He is my court-appointed attorney for the
24  felony wiretapping charge. That's open and pending
25  right now.

28 (Pages 109 to 112)

Page 113

```
 1      Q.  And is he still acting as your
 2  court-appointed attorney in that matter?
 3      A.  Yes.
 4      Q.  You mentioned that you had some recorded
 5  meetings with the physicians already in your
 6  testimony, and that's also referenced in your
 7  discovery.
 8          Do you maintain those recordings still?
 9      A.  I guess.  I believe -- I don't recall.
10  Those were also in the computer in the -- in the
11  felony case where they came in and took it.
12      Q.  How did you go about making those
13  recordings?  Did you use a small --
14      A.  Yes.
15      Q.  -- digital recorder or --
16      A.  Yes.
17      Q.  Okay.  And did you maintain that digital
18  recorder?
19      A.  They had took it.  The -- the search
20  warrant, they have that.
21      Q.  And as far as you know, have all copies
22  of any digital recordings that you -- were created
23  by you been seized?
24      A.  I guess.
25      Q.  Is there a possibility there may be a
```

Page 114

```
 1  recording somewhere at your home just like there may
 2  be a copy of your diary or something like that?
 3      A.  Yes --
 4          MR. POTTER:  Objection; calls for
 5  speculation.
 6  BY MR. TYLER:
 7      Q.  I would just ask if you would also look
 8  for that, if you could.
 9      A.  Okay.
10      Q.  Thank you.  As far as the recordings, do
11  you have any idea of who exactly you recorded?
12          MR. POTTER:  To the extent it gets into
13  the criminal case, I'm going to instruct her not to
14  answer.
15  BY MR. TYLER:
16      Q.  And I'm just -- when you are at
17  MountainView, do you know who you would have
18  recorded at MountainView?
19      A.  Security guards, nurses, lead nurses,
20  Helen Vos, who stated she was in charge of the whole
21  hospital and nobody is above her.  Doctors.
22      Q.  Suffice to say, quite a few recordings,
23  it sounds like?
24      A.  Yes.
25      Q.  Do you have any idea approximately how
```

Page 115

```
 1  many recordings you would have created?
 2      A.  Pertaining to the hospital, probably
 3  about, I don't know, over 20, 30, possibly more.
 4      Q.  And were these more or less an every day
 5  occurrence, or was there certain significance when
 6  you decided you were recording conversations?
 7      A.  Only when the doctors came in and they
 8  talked, because I wanted to remember what they said.
 9      Q.  And when you created these recordings,
10  was the person being recorded on notice that you
11  were making the recording?
12          MR. POTTER:  Objection; calls for a legal
13  conclusion and also knowledge outside of her scope.
14  BY MR. TYLER:
15      Q.  Did you tell the person, when you were
16  making the recordings, that you were recording them?
17      A.  No.  It's not illegal; so I didn't have
18  to.
19      Q.  And when you were creating these
20  recordings, was it located in your pocket?  Was it
21  something you sat on the table?  Would they have
22  known the recorder was there?
23      A.  Sometimes I -- sometimes they were on the
24  table.  Sometimes it was just in my hand.  They
25  could see it in my hands.  Sometimes they could see
```

Page 116

```
 1  it on the table, and sometimes it was in my pocket.
 2      Q.  Would it be reasonable to say that at
 3  least some of these recordings, it's possible they
 4  would not know they were being recorded?
 5          MR. POTTER:  Objection; calls for
 6  speculation as to the word "possible."
 7          THE WITNESS:  Repeat that.
 8  BY MR. TYLER:
 9      Q.  Is it possible that the person being
10  recorded at certain times may not have been aware
11  that you were recording them?
12          MR. POTTER:  Same objection; calls for
13  speculation.
14          THE WITNESS:  Do I answer?
15          MR. POTTER:  Go ahead and answer.
16          THE WITNESS:  It's possible.
17  BY MR. TYLER:
18      Q.  Did you ever have a power of attorney for
19  your father?
20      A.  No.
21      Q.  Did you ever tell anyone that you had a
22  power of attorney?
23      A.  No.
24      Q.  Do you know if one was ever executed
25  while he was a patient at MountainView?
```

29 (Pages 113 to 116)

Page 117

1     A.  I know none was ever executed.  And
2  nobody.
3          (Whereupon, Exhibit C was
4          marked for identification.)
5  BY MR. TYLER:
6     Q.  I will show you Exhibit C.
7          Have you seen this document before?  Or
8  the complete copy of this document before?
9     A.  I have never seen page -- no.  I've only
10  seen page 2.  I've never seen the other pages.
11     Q.  I will represent to you that this is a
12  copy of the security log that's maintained by the
13  security office at MountainView -- security officers
14  at MountainView Hospital.
15     A.  Okay.
16     Q.  And if we take a look, the first page is
17  an entry from March 1st, 2008.  And if you look at
18  the 11:35 entry, it says, Called to ICU 1, family
19  dispute, Metro was also called.
20          Do you see where I'm looking at?
21     A.  No.  I don't see March 1st.  Can I see
22  yours to clarify?  Mine is cut off.
23     Q.  It's the same copy.
24     A.  Is your copy cut off too, also?  Yeah.
25     Q.  But what I'm looking at and -- I'll just

Page 118

1  ask you to assume it's March 1st for the purpose of
2  the deposition today.  Can you look at the 11:35
3  entry with me.
4     A.  Okay.  This never happened March 1st.
5     Q.  Correct.
6     A.  There was never a family dispute on
7  March 1st.
8     Q.  So you've already anticipated my next
9  question.  I've been informed by the security guard
10  that this refers to a family dispute involving
11  yourself, and you maintain that there was not one
12  that occurred on March 1st at 11:35?
13     A.  This must have been March 2nd.  That
14  meeting, that family meeting that we were discussing
15  earlier.
16     Q.  Okay.  So you think this was the family
17  meeting?
18     A.  I think so.  Metro was not called.
19          (Whereupon, Exhibit D was
20          marked for identification.)
21  BY MR. TYLER:
22     Q.  I've handed you Exhibit D, which is
23  charting completed by the nurses at MountainView.  I
24  will have you turn to the third -- the fourth page,
25  and you can see an area that's been highlighted

Page 119

1  there?
2     A.  Yes.
3     Q.  It says, Daughter very hysterical at
4  bedside, patient's sons in to see patient with Metro
5  Police and hospital security.  Steve (son) requested
6  that his dad sign papers for POA.  Told Steve (son)
7  that this could not be done due to the fact that his
8  dad is sedated on Diprivan.  Was told by son they
9  had Metro Police in with them to protect them and us
10  from their sister Joyce (patient's daughter).
11  Administration also notified of incident.  Family
12  conference held with Dr. Codena and Dr. Sinai.
13          Is that what you are referring to as the
14  March 2nd incident?
15     A.  Yes -- no.  I'm not referring to this.  I
16  don't know what this is.  I don't know why she put
17  this.  She put words in my brother's mouth.  My
18  brother -- no.  I don't know if this -- I don't know
19  if this took place or not inside my father's
20  hospital room.  I wasn't there.
21     Q.  Do you know whether or not Steve ever
22  told the MountainView staff that they had Metro with
23  them to protect them and the staff from you?
24     A.  I don't know what Steve said.
25     Q.  Did Steve ever tell you that he had said

Page 120

1  that?
2     A.  No.
3     Q.  Would Steve have any reason to need Metro
4  to protect himself and the staff from you?
5     A.  No.  My brothers are bigger than me.
6  They don't need to be protected.
7     Q.  And your understanding, you testified
8  earlier Metro was just there to keep the peace at
9  Lewis's request?
10     A.  That's what the police officer told me.
11  Lewis was a police officer at the time.  Steve is
12  not a police officer; so he can't request anything
13  from them.
14     Q.  If you go forward -- and actually, let's
15  go off for just one second.
16          (Off the record.)
17  BY MR. TYLER:
18     Q.  And we are looking again at that same
19  page we were just on, which is Bates stamped on the
20  bottom MVH 13, and just below the entry we were just
21  looking at -- and it is again on March 2nd, 2008 --
22  it says, Family informed of limitation on
23  visitation.
24          Do see where I'm looking at?
25     A.  Yes.

30 (Pages 117 to 120)

1    Q.  Do you have any idea what that is in
2  reference to?
3    A.  No.
4    Q.  Do you know, was any limitation ever
5  placed upon your visitation?
6    A.  No.
7    Q.  And was there any discussion about
8  limitation visitation on March 2nd?
9    A.  I don't recall.
10    Q.  Let's go forward to the next page,
11  MVH 14.  And towards the top of the page there is a
12  March 3rd entry.  It says, Patient's daughter Joyce
13  in the room at 2045, asked if she is aware of the
14  five-minute visitation every time.  Acknowledge that
15  she is aware, then left.
16       Do you see where I'm looking at?
17    A.  Yes.
18    Q.  Did you ever have any discussions about a
19  five-minute visitation limit?
20    A.  I don't recall.
21    Q.  And do you recall this interaction at all
22  or anyone telling you that you were limited to a
23  five-minute visitation at this point?
24    A.  I don't recall.
25    Q.  Okay.  Can you please turn with me to

1  MVH 18 and the middle entry for March 5th, 2008.
2       Do you see where I'm at?
3    A.  Yes.
4    Q.  It says, Patient's daughter Joyce came
5  out of the room and went straight to the charge
6  nurse saying that the patient cannot breathe, and
7  that I was not answering her questions and yelling
8  at her, which was not the case.  She came to me and
9  accusing me of laughing at her and that I should not
10  take care of her dad.  Security notified who came to
11  ask her to leave the room and instructed her not to
12  come back to the patient's room if she's acting like
13  this.
14       Did I read that correctly?
15    A.  This is written all out of context.  This
16  nurse --
17    Q.  Just for now --
18       MR. POTTER:  He's just asking you if he
19  read it correctly.
20       THE WITNESS:  You read it correctly but
21  in the wrong tone.
22  BY MR. TYLER:
23    Q.  I understand that, but what is actually
24  recorded by the nurse is what I just read; correct?
25    A.  Yes.

1    Q.  Do you recall this interaction with the
2  nurse?
3    A.  That's not the way it happened, no.
4    Q.  Could you please describe for me your
5  understanding of what actually happened in that
6  situation?
7    A.  My dad could not breathe.  I told her my
8  dad cannot breathe.  And I told her if you're not
9  going to -- she said he can, he can breathe, he's
10  okay.  I said no, he can't, he can't breathe.  He's
11  gasping for air.  You guys do something, you know,
12  and she wouldn't do anything.  I said if you're not
13  going to care for my dad, then get another nurse
14  that will.  I want somebody to take care of him.
15  She laughed at me, and that's what happened.
16    Q.  And did security actually come to the
17  room?
18    A.  I don't recall.  I don't think they did
19  that day.
20    Q.  Do you recall security asking you to
21  leave that day?
22    A.  I don't recall that day.
23    Q.  Do you recall anyone from security
24  instructing you not to come back if you are going to
25  behave like that?

1    A.  No.  I don't recall.  Security didn't say
2  that.  Security said if you come back, we're having
3  you arrested.  They didn't say no if's.  There were
4  no ifs.
5    Q.  Let me show you Exhibit E.
6       (Whereupon, Exhibit E was
7        marked for identification.)
8  BY MR. TYLER:
9    Q.  And what I'm showing you is an incident
10  report from March 7th, 2008.
11       Is that what it purports to be to you?
12    A.  Yes.
13    Q.  And we discussed this earlier.  You were
14  asked about taking a cell phone from your brother.
15       Do you recall that question?
16    A.  Yes.
17    Q.  Is this report one that was generated as
18  a result of that allegation?
19    A.  I don't know what this is.  This is --
20  I've never been -- I've never seen this.
21    Q.  And you've never seen this incident
22  report before?
23    A.  It was never discussed.  This is the
24  first time I'm discussing it.
25    Q.  And it looks like Officer Salgado, the

Page 125

1  best I can make out.
2      Did Officer Salgado ever speak to you
3  about this?
4      A.  There was a secure -- a police officer
5  came into -- I don't know who his name was.
6      Q.  And I'm just looking at reporting
7  officer --
8      A.  There was an officer.  I don't know his
9  name.
10     Q.  What did he tell you had been alleged
11 against you?
12     A.  He just asked if we -- I don't recall.
13 He questioned me if I had seen my brother's phone or
14 something.
15     Q.  And you've never seen the statements that
16 were given by your brother and the nurse that are
17 attached to this exhibit?
18     A.  Other than what you guys posted on the --
19 your complaint -- your answer to the complaint.
20     Q.  So if this was produced in discovery, you
21 read it in that case?  Is that what you're trying to
22 tell me?
23     A.  Yes.
24     Q.  Okay.
25     A.  I think.

Page 126

1      Q.  So you think you have reviewed it since
2  this lawsuit has been instituted?
3      A.  I think I've seen it, yes.
4      Q.  Do you recall what allegations your
5  brother made in his statement?  Otherwise, I will
6  just ask you to read through it quickly, if you can.
7      A.  No, I don't recall.
8      Q.  If you can, will you please read through
9  his statement?
10     A.  Okay.
11     Q.  I will try to paraphrase a little to save
12 us some time, but basically your brother's statement
13 said that he sat down the phone at some point in
14 your father's room and it went missing, and that
15 then he called it, and you answered the cell phone.
16     Do you recall that ever occurring?
17     A.  No.  That's not what he said.  He said he
18 took it out of -- no, it never happened.
19     Q.  Your brother's cell phone never went
20 missing, and he called it and you answered?
21     A.  I never answered.
22     Q.  Did you ever tell your brother that you
23 were going to destroy his phone because he was
24 trying to get a power of attorney?
25     A.  I don't recall.

Page 127

1      Q.  Is there any point where you ever took
2  your brother's cell phone?
3      A.  No.
4      Q.  Did you ever tell the nurse that you
5  don't have a cell phone?
6      A.  No.
7      Q.  Do you normally carry a cell phone?
8      A.  I don't own a cell phone.  I've never
9  owned a cell phone.
10     Q.  Would you disagree with the nurse's
11 statement that she saw you with a cell phone that
12 matched the description of your brother's?
13     A.  Yes.
14     Q.  And at no point did you ever have your
15 brother's cell phone or keep your brother's cell
16 phone from his use?
17     A.  No.
18     Q.  Do you have any idea why your brother
19 made the allegation that you did have his cell
20 phone?
21     A.  No.
22     Q.  Do you believe that this is a false
23 statement by your brother?
24     A.  I don't know.
25         MR. POTTER:  Objection; calls for a legal

Page 128

1  conclusion.
2  BY MR. TYLER:
3      Q.  Was there ever any follow-up on this
4  incident report on the allegations of larceny, as
5  far as you know?
6      A.  Not that I'm aware of.
7      Q.  I'm going to have you look back at
8  Exhibit D.  On Bates stamp page 21, and the first
9  entry there is from March 9th, 2008, and by
10 Shelley Guarnera.
11     Do you see where I'm at?
12     A.  Yes.
13     Q.  It says, Received patient in bed, vitals
14 as per flow sheet.  Patient remains stable.
15 Daughter in room and refusing to leave.  Instructed
16 patient's daughter that we have a history with her
17 and that she will be asked to leave the hospital if
18 she does not follow instructions from hospital
19 staff.  Supervisor and charge nurse aware of
20 situation.
21     Did I read that correctly?
22     A.  Yes.
23     Q.  Is that -- do you have a recollection of
24 that incident on March 9th, 2008?
25     A.  Yes.

32 (Pages 125 to 128)

1    Q.  And what is your recollection?
2    A.  I walked in, said hello to see my father.
3 I said hello to the nurse.  She immediately told me
4 to sit down.  She told me you better not say
5 nothing.  He's getting the operation, and we have a
6 history of you, and if you say anything, we're going
7 to have you kicked out and arrested.  That's the
8 first time I've ever seen that nurse.  She was
9 saying that right in front of my dad.
10    Q.  And when she says, "refusing to leave,"
11 did she ask you to leave at any point?
12    A.  No.
13    Q.  When she says, We have history with her,
14 do you have any idea what she was referring to as
15 far as the history?
16    A.  No.  My dad was going to get the
17 operation.  She didn't want me there.
18    Q.  And did she actually ask you to leave on
19 that night in question?
20    A.  I don't recall.  She threatened me, to
21 kick me out.
22    Q.  And this is the first encounter you'd had
23 with that nurse before?
24    A.  Yes.  That's the first time I had seen
25 her.

1    Q.  On March 11th, 2008, you reference in
2 your discovery responses that you had interaction
3 with Helen Vos, and afterwards you were assaulted
4 and forced to leave the hospital.
5    Do you recall that?
6    A.  Vaguely.
7    Q.  Could you describe for me what that
8 interaction was with Ms. Vos and the subsequent
9 interaction with security?
10    A.  What was the date?
11    Q.  March 11th, 2008.
12    A.  The security guards kept harassing me
13 throughout; so I will try to remember.  They kicked
14 me out.  They wouldn't let me in.  They wouldn't let
15 me be with my dad.  The nurses wouldn't let me be
16 there.
17    I wanted to speak to the lead nurse, and
18 then I spoke to Helen Vos.  She said that she runs
19 the whole hospital.  She is in charge of the whole
20 hospital and nobody is above her, and she's the one
21 to speak to.  She basically runs the whole hospital.
22    So I asked her -- I told her my dad is
23 very sick, and why can't I be with him.  And she
24 said hold on, and she made a phone call, and she
25 called security and had security kick me out then.

1    Q.  And what is your understanding of what
2 Helen Vos's thought process was on kicking you out
3 of the hospital?  Did she tell you --
4    A.  She didn't tell me --
5    Q.  -- why she was upset with you or asking
6 to leave?
7    A.  She didn't tell me.  She was just going
8 by what they told -- they told her on the phone.
9    Q.  During this conversation with Helen Vos,
10 were you using an elevated voice or profanity or was
11 it -- could you describe the conversation, the tone
12 of it?
13    A.  No.  There was a meeting across the way,
14 and they were -- no.  They were in another meeting.
15 I don't know who they were.  I just remember that
16 there were other people in there.
17    Q.  Other people in the meeting?
18    A.  No.  In that office there.
19    Q.  So as far as you know, there was no
20 reason whatsoever why Helen Vos or security became
21 involved in that situation?
22    A.  Other than I -- Helen Vos, I requested
23 that she be involved because I wanted to be with my
24 dad.
25    Q.  But you have no idea why she would have

1 contacted security?
2    A.  No.  I was asking her for help, and she
3 didn't help.  Instead she contacted security and had
4 me kicked out.  And my mom kept calling to try to
5 request let me back in.  She wanted to know why
6 also.
7    Q.  Okay.  I want to turn your attention to
8 Exhibit C again.  That's the security guard log.
9 And go to the second page of that.  It's
10 Bates stamped MVH 31.  And that entry is dated
11 03/12/08.
12    Do you see where I'm looking at the top
13 of the page?
14    A.  Yes.
15    Q.  It says, Dr. Strong in ICU No. 3, visitor
16 Joyce Zaic causing disturbance, asked to leave.
17 Call to administration.  Joyce Zaic talking with
18 Helen Vos.  Standing by.  Escorted Joyce Zaic out of
19 building.
20    Did I read that correctly?
21    A.  Yes.
22    Q.  And do you recall that incident in
23 question?
24    A.  That he summarized it.
25    Q.  And when they say Joyce causing

Page 133

1 disturbance, what type of disturbance would they be
2 describing?
3     A.  There was no disturbance.  I have no
4 idea.
5     Q.  And you didn't have any interaction with
6 any MountainView staff or any kind of words with
7 anyone that was an employee?
8     A.  No.
9     Q.  And do you have any idea who asked you to
10 leave or why?
11     A.  No.
12     Q.  And you don't --
13     A.  No.  I don't know.
14     Q.  And you don't remember interacting with
15 any of the nursing staff or anyone else?
16     A.  No.  I might have -- if I remember
17 something vaguely, I think I asked them for a status
18 update on my dad, and they wouldn't give me one.
19     Q.  And then how did it progress --
20     A.  And then they kicked me out.
21     Q.  How did it progress from you asking for a
22 status update to getting kicked out?
23     A.  I don't know.  They wouldn't let me be
24 with my dad.  I have no idea.
25     Q.  No other interaction between you and the

Page 134

1 staff other than just asking for a status update?
2     A.  Yes.  That's it.
3     Q.  I want to show you what will be F.
4         (Whereupon, Exhibit F was
5         marked for identification.)
6         MR. TYLER:  We'll come back to it.  Let's
7 make this G.
8         (Whereupon, Exhibit G was
9         marked for identification.)
10 BY MR. TYLER:
11     Q.  I'm giving you G, which is a document
12 created by security for MountainView in reference to
13 that same date.  I'm looking at Bates Stamp MVH 33,
14 and at the top it's dated March 12th, 2008.
15         Do you see what I'm looking at?
16     A.  Yes.
17     Q.  And it says, We are again having problems
18 with a visitor, Joyce Zaic, in ICU No. 3,
19 Room No. 229.  Helen Vos and myself have come up
20 with a temporary solution to this.  Joyce will only
21 be allowed in the hospital at 10:00 a.m. and
22 2:00 p.m. for five minutes to visit her father.  ICU
23 nurses will call when she arrives and we will go
24 stand by.  If for any reason she begins to display
25 hostility towards the staff or does not stick to the

Page 135

1 five-minute visitation, she will be trespassed and
2 not be allowed in the hospital.  This has been
3 explained to Joyce.  If you have any other problems,
4 such as she refuses to leave after being told to,
5 call Metro and have her trespassed.
6         Did I read that correctly?
7     A.  Yes.
8     Q.  Do you recall having a conversation like
9 this with Chris Simms and Helen Vos?
10     A.  No.  This conversation never occurred.
11     Q.  There was no conversation whatsoever with
12 the two of them, or it just was different than the
13 way it's recorded in this statement?
14     A.  It was -- it never occurred.  It wasn't
15 different.  It never happened.  This conversation
16 never took place with me.
17     Q.  And did you ever have any conversations
18 with Chris Simms at all on March 12th, 2008?
19     A.  I don't recall.
20     Q.  At any point did anyone, other than
21 Helen Vos or Chris Simms, discuss with you any type
22 of limited visitation?
23     A.  No.
24     Q.  At any point later on was this discussed
25 at all?

Page 136

1     A.  I don't recall.
2     Q.  As far as you're concerned, though, this
3 conversation or any limitations never existed?
4     A.  It was never brought to my attention.
5     Q.  All right.  I want to look again at the
6 security log, Exhibit C.  I'm looking at the middle
7 of Bates stamp MVH 31.  And there's three separate
8 entries for 03/13/08.
9         The first one says, Checked ICU No. 3,
10 Room No. 229, to see if visitor Joyce Zaic has
11 arrived.
12         Then Clear from ICU No. 3, Zaic did not
13 arrive.  Called to Room No. 229, visitor Joyce Zaic
14 is in room.
15         And then there is another entry at 1310,
16 Joyce Zaic left property.
17         Did I read those correctly?
18     A.  Yes.
19     Q.  Do you have any idea why they would have
20 been checking the room or timing the length of your
21 visitation if the five-minute visitation had not
22 been in effect at that point?
23     A.  They're stalking me.  They're harassing
24 me.  They have nothing else better to do than to
25 harass me.  They are bored with their job.

1    Q.  So as far as you know, the statements
2  that are entered here have nothing to do with any
3  type of limited visitation?
4    A.  As far as I'm aware.
5    Q.  And do you remember interacting with
6  security on this day in question?
7    A.  I don't remember.
8    Q.  Is there any particular reason you only
9  visited your father for five minutes on this date?
10    A.  On this date?
11    Q.  Is that a "no"?
12    A.  I don't recall.
13    Q.  Again, the entry directly below that is
14  for 03/14/08.  Stand by in ICU No. 3, waiting for
15  visitor for Room No. 229.  Clear ICU No. 3, visitor
16  did not show up.  Stand by ICU No. 3, Room No. 229,
17  Joyce Zaic here to see father.  Clear from ICU
18  No. 3.
19        And the timings on those are at
20  10:00 a.m. and then about 12:30.  Any idea why they
21  would have been waiting for you or monitoring you on
22  that date?
23    A.  To harass me.
24    Q.  And at this point, it still would have
25  nothing to do with any type of limited visitation

1  scheduled for you?
2    A.  They might have -- not as far as I'm
3  aware.  There might not have been one.  They
4  might -- I didn't know of any.  If they set one
5  between themselves, nobody let me know about it.
6    Q.  Let me go ahead and have you go to the
7  next page.  And this is an entry from March 15th,
8  2008.  It says, Received call -- I'm at 10:25.  It
9  says, Received call from PBX that above visitor
10  showed up to visit.  I told her she would have to
11  leave that hospital, that visiting times for her
12  were 10:00 to 10:05 and 1400 to 1405.  She started
13  hollering and swearing at me at the time of
14  extraction.  Report to follow.
15        Do you recall that incident at all?
16    A.  Who was this?
17    Q.  This would have been entered by the
18  security guard.
19    A.  This is the security guard writing this?
20    Q.  Yeah.
21    A.  No.  I didn't have that conversation with
22  the security guard.
23    Q.  Did you have any interaction with the
24  security guard at all on March 15th, 2008?
25    A.  No.  I don't recall.

1    Q.  Do you know if you were asked to leave
2  the hospital on March 15th, 2008?
3    A.  I was asked to leave the hospital several
4  times.  I don't recall the dates.  I recall some of
5  the dates but not all of them.
6    Q.  Do you know if you were, quote, hollering
7  and swearing at anyone on that date?
8    A.  It was March 17th.  No, I was not
9  hollering and swearing.
10    Q.  As far as you know, there was no
11  altercations at all on March 15th?
12    A.  No.
13        MR. POTTER:  She said 17th.  I think
14  you're saying 15th.
15        He's talking 17th -- or 15th.
16        THE WITNESS:  No, nothing on the 15th.
17  BY MR. TYLER:
18    Q.  I'm going to have you look at Exhibit D,
19  and that's the nurse charting.  I'm on Bates stamp
20  MVH 24.  And at the -- the top entry is also dated
21  March 15th, 2008.
22        Do you see where I'm at?
23    A.  Yes.
24    Q.  It says, Received report, assessment
25  done.  Sedated, on vent.  Continue with Primacor and

1  Levophed infusions.  10:25, daughter Joyce in, not
2  during established visiting times.  Security
3  notified.  Before security arrived in ICU, she was
4  very agitated, yelling at desk, demanding that Metro
5  be called, calling nurse a liar about the visitation
6  rules, escorted out of ICU, yelling at security out
7  into the hall.  Heard by other visitors who came out
8  to stand in doorways.
9        Did I read that correctly?
10    A.  Yes.
11    Q.  Again, this is the same date and time as
12  the security guard entry we just looked at.
13        Does this refresh your recollection at
14  all whether anything occurred on the 15th?
15    A.  Yes.  But I thought it was the 16th.
16    Q.  And what did this trigger in your memory
17  as to the occurrence on the 15th?
18    A.  I came, and I went to visit my dad, and
19  this nurse said you're not allowed here.  You're
20  only allowed here certain times or whatever.  And I
21  didn't know what she was talking about.  She
22  wouldn't let me be with my dad, and then they -- I
23  think they called security or I went to Helen Vos, I
24  don't remember.  Something happened, and the next
25  thing I know, security had me in handcuffs out in

1  the parking lot.  And the police --
2      Q.  And I don't mean to interrupt you, but I
3  think you may be confusing the 15th and 17th again.
4      A.  Okay.
5      Q.  As far as I know, you were never
6  handcuffed the 15th, but if that's different, please
7  let me know.
8      A.  Okay, I'm confused.  Maybe I'm confusing
9  them again.  So this must -- the Helen Vos thing is
10  another one.  There were so many of them.  She said
11  I'm not allowed here.  I didn't know what she was
12  talking about, and she wouldn't let me be with my
13  dad.
14      Q.  At this point had several people told you
15  that you are not allowed because of -- your
16  visitation is limited at this stage?
17      A.  I think that's -- they kept saying that,
18  and I don't know what they're talking about because
19  it wasn't limited.  Nobody never told me it was
20  limited.
21      Q.  When these nurses kept telling you that
22  you had limited visitation, did you ever follow up
23  on that if you didn't know what they were referring
24  to?
25      A.  I tried to speak to Helen Vos about it,

1  and my family members also tried to talk.  Yes, I
2  tried.
3      Q.  At this point, you maintain you still
4  didn't know about any type of limitation on your
5  visitation?
6      A.  I don't know anything about a limitation.
7      Q.  And you hadn't been able to follow up and
8  get any information from anyone else?
9      A.  No.
10      Q.  Do you recall yelling at the desk?  I
11  assume that means the nurses' station.
12      A.  No.
13      Q.  Do you recall demanding that Metro be
14  called?
15      A.  I don't recall, but I could have because
16  they wouldn't let me see my dad.
17          And I would like to back up.  I think
18  with the five-minute thing, I think the doctor did
19  say when my dad was trying to heal, he just wanted
20  us in there for five minutes at a time.  But then
21  she lifted that and we were in there.  She just said
22  for a day or two, and then we were allowed to go
23  back in there during normal visiting hours.
24      Q.  So the only limitation you ever know of
25  on your visitation would have been a

1  physician-instituted one for a couple days?
2      A.  Yes, like a day or two.
3      Q.  And you're not aware of any one that was
4  done in conjunction with security in the nurses'
5  desk?
6      A.  No.
7      Q.  Do you recall calling the nurse a liar at
8  all during this interaction?
9      A.  No.
10      Q.  And do you remember being walked out of
11  the ICU?
12      A.  No.
13      Q.  Any yelling at the staff?
14      A.  No yelling at the staff.  I don't
15  remember if I walked out of ICU myself to get
16  Helen Vos for help.  I also went to Todd Isbell's
17  office for help.  He's in charge of the ICU.  That's
18  what he said.  And then Helen Vos is in charge of
19  the whole nursing unit, in the whole hospital she
20  stated.
21      Q.  And do you remember when this whole scene
22  transpired?  Do you remember other patients or their
23  families or visitors coming out in the hallway to
24  see what was going on?
25      A.  I don't recall.

1      Q.  Now, the 17th, which I know you remember
2  that one.  So let's go first to Exhibit C, which is
3  the security log.  And I'm on Bates stamp MVH 32.
4          It says, Received phone call from
5  Joyce Zaic (aka Pam Browne).  Zaic making harassing
6  phone calls to administration.  Verbally abusive
7  towards me on phone.  Spoke with staff in ICU No. 3
8  regarding Joyce Zaic.  Called to ICU No. 3.
9  Joyce Zaic on property.  Had PBX contact Metro for
10  trespass.  Zaic became combative striking Maurice
11  twice.  Zaic placed in handcuffs.  Metro arrive.
12  Zaic formally trespassed.
13          Do you recall -- did I read that
14  correctly, first of all?
15      A.  You read it.
16      Q.  You do recall the incidents of
17  March 17th?
18      A.  No.
19      Q.  You don't recall them at all?
20      A.  Not all of them.  That didn't happen like
21  that.
22      Q.  Do you recall initially making calls to
23  MountainView identifying yourself as Pam Browne?
24      A.  Yes.
25      Q.  And why were you calling as Pam Browne?

Page 145

1   A.   Because they wouldn't answer questions.
2   They wouldn't -- the operator would not send
3   Joyce Zaic through.  She kept saying who is this.
4   She wanted to know who it was when I called them and
5   I asked can you connect me to ICU, the ICU room.
6   And she asked who it was and she kept hanging up on
7   me.
8       Q.   And do you have any idea why she wouldn't
9   forward your calls or why she would be hanging up on
10  you?
11      A.   Security must have told her to.
12      Q.   Had they discussed you having any kind of
13  problems with you calling in?
14      A.   No.  They didn't discuss anything with
15  me.  They just kept hanging up on me.
16      Q.   Had you had any problems with calling in
17  before this.
18      A.   I called.  I wanted to see my dad.  I
19  wanted to know what is the status of his health.  I
20  called.  Yes, I called.  And they said that they're
21  going to allow everybody in there; so I called and
22  disguised myself as Pam Browne.
23      Q.   And how frequently were you calling at
24  this point?
25      A.   I don't recall.

Page 146

1       Q.   Did you ever make any kind of threats
2   during these phone calls?
3       A.   No.
4       Q.   They say, Making harassing phone calls to
5   administration.
6            Did you place any calls to
7   administration?
8       A.   Helen Vos is administration.  I tried to
9   get ahold of her to ask why.  I wanted an answer
10  why.
11      Q.   Anybody else in administration you were
12  calling?
13      A.   No.
14      Q.   At this point, were you still using the
15  alias?
16      A.   No.
17      Q.   And this is an entry by the security
18  guard.  It says, Verbally abusive towards me on
19  phone.
20           Do you remember talking to the security
21  guard?
22      A.   When I called in to -- when I called the
23  nurse, she transferred me to security.  Not the
24  nurse, but I called the -- the operator would pick
25  up and transfer me to security instead of

Page 147

1   transferring me to ICU.
2       Q.   But do you remember your conversation
3   with security, though?
4       A.   No.
5       Q.   Do you remember being verbally abusive at
6   all during any of these calls?
7       A.   No.  No abusive verbally, no.
8       Q.   Any raised voice or use of profanity?
9       A.   No.
10      Q.   Did you eventually visit the property
11  later that day?
12      A.   What day is this?  The 17th?
13      Q.   The 17th.
14      A.   This is around the same time.  I
15  believe -- yeah, I think so.  I don't recall.  I
16  don't know exactly what happened.  I think they let
17  me in.
18      Q.   Do you remember being asked to leave at a
19  certain point during your visitation?
20      A.   Yes.
21      Q.   And why -- what is your understanding of
22  why you were asked to leave?
23      A.   I don't know.
24      Q.   Did you have any kind of --
25      A.   They wouldn't tell me.

Page 148

1       Q.   I'm sorry, go ahead.
2       A.   They wouldn't tell me.
3       Q.   Did you have any interactions with
4   anyone, any altercations, any verbal disputes?
5       A.   No.  They said because I'm not supposed
6   to be there.  I think that's what they said why
7   they're kicking me out.  I'm only allowed there five
8   minutes or something.  10:00 and 2:00 or something,
9   like what it says.
10      Q.   Who was it that told you this?  The nurse
11  or security?
12      A.   I don't recall.
13      Q.   When you were asked to leave the
14  hospital, did you go under your own volition, or how
15  did that transpire?
16      A.   Security -- security forced me out.
17  Security came into Helen Vos' office --
18      Q.   So security came into your dad's room?
19  Or were you somewhere else on the property?
20      A.   I think I was in Helen Vos' office again.
21  I don't recall.
22      Q.   Okay.  So they came to Helen Vos' office,
23  and then did they ask you to leave and you left, or
24  what happened after that?
25      A.   They took orders from Helen Vos, and they

Page 149

1   told -- I don't recall. Security, they had me in
2   handcuffs, so --
3       Q.  So they go to Helen Vos' office. Were
4   you handcuffed right away? Were you walked out of
5   the hospital? Did you leave on your own? How did
6   you end up getting to that point?
7       A.  I don't recall.
8       Q.  Somebody did handcuff you?
9       A.  I think they followed me out to -- they
10  followed me out. Security followed me out.
11      Q.  They followed you out of the front of the
12  hospital?
13      A.  From the 17th -- yes.
14      Q.  And then what happened from there once
15  you got outside of the hospital?
16      A.  I -- they kept following me. I didn't
17  want them to know what kind of car I drove.
18      Q.  So security followed you to the parking
19  lot?
20      A.  Yes. They're following me out to the
21  parking lot --
22      Q.  At this point there had not been any
23  physical contact with them or altercations?
24      A.  I don't remember. I don't recall.
25      Q.  So you're in the parking lot. What

Page 150

1   happens at that point?
2       A.  I think they said they were going to have
3   me arrested.
4       Q.  And what did you do then?
5       A.  I went and sat on the park bench in front
6   of Tenaya. Not the park -- yeah, the bus stop
7   bench, waiting for the security guards to leave the
8   parking lot so I can get in my truck to leave.
9       Q.  And did you ask them at any point if you
10  could get in your truck to leave?
11      A.  They said -- yes, they did. They said,
12  If you come on this property, we're going to arrest
13  you. And, you know, so I was waiting for them to
14  leave so I can go back on the property so they
15  wouldn't see what kind of car I was driving. And
16  they wouldn't leave. They kept waiting for me
17  there. They were watching me.
18      Q.  So once you get to the bus stop, how long
19  is it until you have more interaction with the
20  security guards?
21      A.  They were interacting the whole time.
22  They were calling me names as I was sitting there at
23  the bus stop, and they wouldn't leave.
24      Q.  Who was there as far as security guards?
25  Was it security guards, plural?

Page 151

1       A.  Maurice was there, and then
2   Christopher Simms came afterwards.
3       Q.  Just the two of them?
4       A.  I think there was a third one. I
5   don't -- there was a third one. I don't recall,
6   though.
7       Q.  So they are standing in the parking lot.
8   You are sitting on the bench.
9           You said they were having interactions
10  with you, calling you names?
11      A.  Yes.
12      Q.  What were they saying?
13      A.  Oh, you're -- they were calling me names,
14  derogatory names, b-i-t-c-h, c-u-n-t. They were
15  just calling me names. They were being awful,
16  Maurice was.
17      Q.  And the other security guards were
18  present, all three of them were there?
19      A.  No, just Maurice was at that time. The
20  one left. The one went inside, and then Maurice
21  came back out when the --
22      Q.  So how long did this go on that you were
23  sitting at the bus stop and Maurice was waiting in
24  the parking lot?
25      A.  I don't know exactly, but if I had to

Page 152

1   approximate, probably -- it felt like maybe half an
2   hour, 15 -- between 15 minutes and a half an hour, a
3   long time maybe, yeah.
4       Q.  And what was your thought process? You
5   were just trying to wait him out to get back to your
6   truck --
7       A.  Yes.
8       Q.  -- or you were waiting for Metro, or
9   what?
10      A.  No. Metro, I didn't -- Metro wasn't even
11  on my mind. I didn't even think Metro was going to
12  come. I didn't do anything wrong.
13      Q.  So after a half hour of conversation back
14  and forth with Maurice, what happened then?
15      A.  Then he starts running after. I see him.
16  I'm watching him. He gets on his intercom, his
17  walkie-talkie or whatever, and then he comes back
18  running towards me. He said, My boss just told me
19  that we own the sidewalk or something. Because I
20  said you can't touch me over here. You don't own
21  the sidewalk. The City owns the sidewalk. You
22  can't, you know -- this isn't your property.
23          And then he gets on the intercom. He
24  goes, My boss just told me this is -- we -- in
25  hospital owns the sidewalk and to put you in

38 (Pages 149 to 152)

1 handcuffs, whatever he said, to arrest you, have you
2 arrested.
3      So he started chasing me across Tenaya.
4 I'm running across the street, and in the middle of
5 the street cars were honking, and he tackled me in
6 the middle of the street, grabbed me, put me in
7 handcuffs in the middle of the street, and pulled me
8 back onto the parking lot, in -- on -- to the
9 hospital.
10     Q.   When would this have been approximately
11 during the day? Afternoon? Morning? Night?
12     A.   Afternoon.
13     Q.   Afternoon?
14     A.   Late afternoon.
15     Q.   And I assume late afternoon Tenaya was
16 fairly busy?
17     A.   It was busy.
18     Q.   When you guys ran out into the street,
19 did it cause a scene with traffic --
20     A.   Yes.
21     Q.   -- did anybody stop or anything?
22     A.   They honked. They didn't stop. They
23 honked and they yelled out the window, and that's
24 it. That's what they did.
25     Q.   So once Maurice follows you on Tenaya,

1 pulls you back into the parking lot -- first of all,
2 describe for me how he pulled you back from Tenaya
3 into the parking lot.
4     A.   He handcuffed me in the middle of Tenaya.
5     Q.   Behind your back?
6     A.   Yes.
7     Q.   Do you know if he double locked you?
8     A.   I don't know what that means.
9     Q.   He used regular handcuffs like you've
10 seen before, the metal handcuffs, or did he have zip
11 ties, or do you know?
12     A.   They were handcuffs.
13     Q.   Okay. He handcuffed you behind your back
14 and took you back into the parking lot, and then
15 what happened?
16     A.   Yes.
17     Q.   What happened after that?
18     A.   He pulled me by my arm in the parking
19 lot, and he forced me to sit down, and then the
20 police arrived and Chris Simms was there, and, you
21 know, he kept pulling my arm up so it was like
22 jerking, and I told Chris Simms, you know, Look,
23 he's doing this. Make him stop. You know --
24     Q.   This being Maurice?
25     A.   Yes. I go, Make him stop. I said,

1 You're his boss. Make him stop. You know, I
2 thought he would do the right thing, and he didn't.
3     Q.   And this is while you are sitting on the
4 ground waiting for Metro, he is pulling on your arm?
5     A.   I think so. He did it when I was
6 standing up and when I was sitting down.
7     Q.   And were you sitting on a curb, or what
8 were you sitting on?
9     A.   No. There was cement, and then there was
10 grass, and then there was both.
11     Q.   But were you physically sitting on the
12 asphalt or sitting on a curb or the grass or --
13     A.   I remember asphalt, and then I also
14 remember grass; so I remember both.
15     Q.   And did you suffer any kind of injury
16 because of the handcuff?
17     A.   There was bruises.
18     Q.   Did you take any pictures of that?
19     A.   No.
20     Q.   Did you seek any medical treatment for
21 that?
22     A.   No.
23     Q.   And what about with Maurice pulling on
24 your arm?
25     A.   He was pulling on my arm. He was pulling

1 them up, trying to hurt me, like pulling it up.
2     Q.   Did he give you any reason why he was
3 doing that?
4     A.   No. He didn't talk. The guy didn't
5 talk. He was doing that because he wanted to hurt
6 me.
7     Q.   And when Metro arrived, did you tell them
8 that that had occurred?
9     A.   Yes.
10     Q.   And what did Metro say?
11     A.   I said I think my arm is broken. He kept
12 pulling on it. He didn't say anything. He yelled
13 at me. He said if your arm was broken, you would
14 know it.
15     Q.   This is the Metro officer?
16     A.   Yes.
17     Q.   Describe for me, if you can, the
18 interaction the Metro officer had in chronological
19 order, if he talked to you first or security first
20 and what you remember him saying.
21     A.   He talked to security. He didn't talk to
22 anybody. He just said -- I don't remember him -- I
23 don't recall him talking to anybody. I think he
24 just -- he said, Last time I came, you left. He was
25 yelling at me, You left the scene last time I was

1   called here.
2          And then I think he told them to take the
3   handcuffs off me, I think.  And -- and then he
4   said -- he said -- I think -- he said he is going to
5   have me arrested.  And then he checked, I think the
6   security guard -- the security guard said, We want
7   her arrested.  And he called the police on the
8   phone, whatever, his car, and then he came back and
9   he said, You're lucky I'm not arresting you.
10         I said, I'm supposed to be here.  I'm
11  allowed to be here, you know.  You can call my
12  brothers.  They will tell you I'm allowed to be
13  here.  And my dad is up there in the hospital room,
14  and he's sick, and I just want to be here with him.
15         And he said -- him -- and he said no.  He
16  goes, I don't have any jurisdiction over this
17  hospital.  If they want you kicked out, you have to
18  be kicked out.  I'm not even allowed in this
19  hospital unless they say I'm allowed here.  He goes,
20  And I'm the police.
21         So -- and he threatened me, said he was
22  going to have me arrested, and then I gave him my
23  brothers' phone numbers.  I said to call my
24  brothers.  They're police officers.  They will tell
25  you I'm allowed to be here.  I thought my brothers

1   would help me in the situation when I'm going to be
2   arrested.
3          And he said he tried to call one and he
4   couldn't get ahold of one, and the other one he got
5   ahold of, he said.  And my brother told him -- I
6   don't know what he said.  I don't know the
7   conversation between those two.
8          He came back and he said, You're lucky
9   I'm not arresting you.  There's no -- there's no
10  proof of your prior trespassing.
11     Q.   When he said that I had been here before
12  and I missed you, do you know what he was
13  referencing, the Metro officer?
14     A.   No.
15     Q.   Do you have any idea of Metro being
16  called to come arrest you?
17     A.   Maybe one of the previous times when
18  security kicked me out, they might have called.  I
19  don't know.
20     Q.   Any other interaction with the officer at
21  that point?
22     A.   He said if you come back here,
23  we're going to arrest you.  And I got in my car and
24  left.
25     Q.   And at that point they let you go?

1      A.   That's what I can recall.  There might
2   have been more.  I just don't recall at this time.
3      Q.   Let me show you F, which you already
4   marked.
5          (Whereupon, Exhibit F was
6           marked for identification.)
7   BY MR. TYLER:
8      Q.   This is the actual risk report created by
9   Chris Simms, and at the bottom it says, On Monday,
10  March 17th, 2008, at 1450 hours, I, Chris Simms, was
11  contacted via telephone that visitor Joyce Zaic was
12  causing a disturbance inside the unit, yelling and
13  screaming at the nursing staff.  I advised Security
14  Officer Maurice Daveu to respond to the location.
15  On my arrival nursing staff told me that Maurice had
16  already walked Zaic out of the unit and was heading
17  towards the elevator.
18         Is this your understanding this is the
19  same incident that we have just been discussing?
20     A.   Yes.
21     Q.   And it lists that that occurred
22  approximately 1450 hours.
23         Do you have any reason to dispute that?
24     A.   No.  That's approximate.
25     Q.   Okay.  Let me show you Exhibit H.

1          (Whereupon, Exhibit H was
2           marked for identification.)
3   BY MR. TYLER:
4      Q.   This is Bates stamped MVH 35 and MVH 36.
5          MR. POTTER:  Right there at the bottom.
6   BY MR. TYLER:
7      Q.   Have you seen this document before?
8      A.   No.
9      Q.   Are you familiar with trespass cards?
10     A.   No.
11     Q.   Have you ever seen one before?
12     A.   No.
13     Q.   This trespass card on MVH 35 lists your
14  name and date of trespass as 03/17/08 and a time of
15  1520.
16         Did you ever receive this card on that
17  time -- at that date and time?
18     A.   I don't recall.
19     Q.   Is it possible that the officer would
20  have gave you this card at that date and time?
21         MR. POTTER:  Objection; calls for
22  speculation.
23         THE WITNESS:  I don't recall.
24  BY MR. TYLER:
25     Q.   Do you remember anyone discussing a